**Riley L. PARNELL et ux., Plaintiffs,**

v.

**UNITED STATES of America,
Defendant.**

**J. H. REED, Jr., et ux., Plaintiffs,**

v.

**UNITED STATES of America,
Defendant.**

**Civ. A. Nos. 2292, 2452.**

United States District Court
M. D. Tennessee.
Oct. 29, 1958.

William Waller, Sr., of Waller, Davis & Lansden, Nashville, Tenn., for plaintiffs.

Fred Elledge, Jr., U. S. Atty., Nashville, Tenn., and Leo M. McCormack, Tax Division, Dept. of Justice, Washington, D. C., for defendant.

WILLIAM E. MILLER, District Judge.

1. Plaintiffs in each of these cases, which were consolidated because they involve the same legal question, seek the recovery of alleged overpayments of income taxes with interest. The year in-

volved in the Parnell case was 1952. The year involved in the Reed case is 1954. In each case the plaintiffs, in computing their income taxes, claimed as a deduction for amortizable bond premium the difference between the cost of bonds purchased by them and the lower of two alternative prices at which the bonds might be called prior to their maturity. The entire premium was deducted in the year of purchase because the bonds were callable at either the regular call price or the special call price on thirty days published notice, and the bonds were purchased more than thirty days before the end of the year. The statute involved in the Parnell case is Section 125, Internal Revenue Code of 1939, 26 U.S.C.A. § 125. The statute involved in the Reed case is Section 171, Internal Revenue Code of 1954, 26 U.S.C.A. § 171. The Parnell case involves First Mortgage Bonds, 3¾% Series, due June 1, 1981, of Appalachian Electric Power Company, dated June, 1951, which were purchased by the plaintiff, Riley L. Parnell, on September 23, 1952. The Reed case involved Georgia Power Company First Mortgage Bonds, 3⅜% Series, due 1977, dated December 1, 1947, which were issued in 1947 and purchased by plaintiff, J. H. Reed, Jr., on October 29, 1954. In each case the Commissioner of Internal Revenue disallowed a part of the deduction on the theory that the regular call price of the bonds should have been used rather than the special call price in determining the amount of amortizable bond premium. The regular call price of the Appalachian bonds effective in September, 1952, at the time they were purchased by plaintiff, Riley L. Parnell, was the principal amount plus 5⅝% and the special call price was the principal amount plus 2⅜%.

2. It has long been customary for corporate bonds to contain provisions whereby they may be called or redeemed prior to maturity at descending scales of call prices specified in the indenture. The so-called regular call price is usually higher than the so-called special call

price. This is because the purpose of the general call price is to permit the borrowing company to refinance the indebtedness at a lower interest rate or on better terms. Investors whose bonds are called for this purpose must obtain other investments, and a so-called penalty is provided to compensate them for the lower interest rate they will obtain. This penalty also serves to discourage the borrower from refinancing merely because of a slight change in interest rates. The special call price, on the other hand, is for the purpose of permitting the borrowing company to utilize, in retiring indebtedness, cash generated from operations and paid into sinking funds and similar funds, according to specified formulae, as well as cash derived from the sale of properties, insurance proceeds, etc. A corollary purpose is to protect the bondholders' security by requiring the aggregate indebtedness to be reduced before maturity, unless additions are made to the mortgaged properties to compensate for the failure to reduce the indebtedness. There are innumerable variations in bond indentures with respect to the conditions under which bonds must be or may be called at the special call prices. It is frequently required that a certain per cent of the original indebtedness be called each year at the special call price out of a sinking fund (or other fund) required to be set aside for that purpose. The company is frequently authorized to tender bonds into the sinking fund (or other fund) in lieu of cash. If cash is deposited, it may customarily be used to purchase bonds if available at a price lower than the special call price. The company may also be permitted to certify property additions to the trustee in lieu of cash, or to withdraw cash against certification of property additions. In any such event, the property additions may not thereafter be used as the basis for issuing additional bonds, as would otherwise be permitted. Cash not used for these purposes must be used to call bonds. Provisions of this type are customary in public utility bond indentures.

3. Section 20 of the supplemental indenture securing the Appalachian bonds involved in the Parnell case required that, on or before March 1 of each year beginning with the year 1953, the company deposit with the corporate trustee an amount in cash or principal amount of the bonds of that series equivalent to 1% of the greatest principal amount of that series at any time outstanding but with the privilege to the company of certifying property additions in lieu of depositing cash or bonds. In many indentures the term "sinking fund" is used to describe such deposits, but in the Appalachian indenture this terminology is not used. Section 40 of the indenture further required the company, subject to the privilege of certifying property additions, to make annual deposits in cash or principal amount of bonds of any series equal to the amount by which a defined percentage of the base operating revenues during the preceding calendar year exceeded the aggregate amounts expended for repairs and maintenance. The indenture also required the deposit with the corporate trustee of the proceeds of sale of released properties and fire insurance proceeds, but permitted this cash to be withdrawn against certification of property additions. Cash held by the corporate trustee and not withdrawn against certification of property additions was required to be used either to call bonds at the special call price or to purchase bonds for retirement. Up to the time of the hearing the company had consistently exercised its privilege of offsetting the annual deposits of cash, which would otherwise have been required, by credits for property additions and waiver of authentication of bonds and by withdrawing proceeds of sale of released properties and insurance for property additions. During the three years 1952, 1953 and 1954 the requirements under Section 20 and Section 40 and the proceeds of released property aggregated $3,150,056.94, so that Appalachian Electric Power Company had the right under the indenture during these three years to call $3,150,056.94 of its bonds of the 3¾% Series, due 1981, at the special call prices, and might have chosen to do so instead of spending this amount of money for property additions and certifying these property additions to the trustee. The company could have used these property additions as the basis for the authentication by the trustee of a new series of bonds, and in that event the company would have deposited cash or bonds with the trustee under Section 20 and Section 40. There were only $17,000,000 bonds of this issue and the company would normally have called them at the special call prices rather than at the regular call prices, if it desired to call them at all, because the special call prices were lower. At the time of the hearing none of the bonds had been called at either the special call prices or the general call prices.

4. The indenture securing the Georgia Power Company bonds contains similar provisions except, that, beginning in 1950, the company was required to deposit cash in the sinking fund and was not permitted to certify property additions in lieu thereof. It was, however, permitted to certify property additions for maintenance fund purposes. Cash in these funds could be used to call bonds of any series at the special call price, or to purchase such bonds on the open market. During the years 1950–1958, $13,399,340 in cash was deposited in the sinking fund. Of this amount, $13,064,118.20 was used to call bonds of series other than the series here involved at the special call prices, and $234,165 to purchase bonds of other series. None of the bonds of this particular series have as yet been called at either the special call prices or the regular call prices. During the years 1952–1955 the maintenance fund requirements for all bonds issued under the indenture, including the series here involved, aggregated $18,534,518.16, but these requirements were satisfied by certification of property additions. There were a total of only $10,000,000 bonds outstanding of the series owned by the

plaintiff, Reed. If the company had desired to call bonds of this series, it could have done so by utilizing the cash in the sinking fund, or by paying cash into the maintenance fund and using the property additions as the basis for the authentication of bonds of a new series. Again it is obvious that if the company had desired to call bonds of this particular series, it would have normally called them at the special call prices and not the general call prices because the special call prices were lower.

5. Regulations 118, Section 39.125 (b), states, in effect, that bond premium on any bond to which Section 125 applies shall be determined with reference to "the amount payable at maturity or, in the case of a callable bond, earlier call date." The Regulation further provides:

"  *   *   * The earlier call date may be the earliest call date specified in the bond as a day certain, the earliest interest payment date if the bond is callable at such date, the earliest date at which the bond is callable at par, or such other call date, prior to maturity, specified in the bond as may be selected by the taxpayer. A taxpayer who deducts amortizable bond premium with reference to a particular call date may not thereafter use a different call date in the calculation of amortization deductions with respect to such premium."

The method of determining the amount of bond premium employed by plaintiffs was a method prescribed as reasonable by these regulations, which were issued by the Commissioner of Internal Revenue with the approval of the Secretary of the Treasury. If, however, the method employed by these plaintiffs was not that prescribed by the regulations, it was nevertheless a reasonable method, as applied to corporate bonds in general, including the bonds here involved, and was regularly employed by the plaintiff taxpayers.

6. It would be impractical to devise a "regular method" of amortizing bond premium which would permit determination of amount of bond premium with reference to call prices in the case of some bonds, but not in the case of other bonds, depending upon whether or not the particular bonds are "reasonably and realistically callable for redemption" at such prices. Whether any particular bonds will or will not be called before maturity at either the special call prices or the regular call prices, and if so, how many bonds will be called, and in what year they will be called, are matters which depend upon varying indenture provisions and upon unpredictable future conditions and company policies.

7. In 1956 the Commissioner of Internal Revenue published Revenue Ruling 56–398, which contained the following language but did not indicate the particular bonds involved:

"  *   *   * In permitting amortizable bond premium deductions upon the 'earlier [than maturity] call date.' Section 125 of the 1939 Code and the regulations applicable thereunder contemplated that there be the likelihood of general redemption, in whole or in specified or ascertainable part, of the bond issue or series, so that a bondholder is enabled to establish that his bond or bonds is then reasonably and realistically callable for redemption at a certain price. As between the 'special' and 'general' redemption prices provided for in respect of the instant bonds, this manifestly is true regarding the latter but not the former (in advance of actual notice of call.)"

The Appalachian and Georgia bonds involved in this cause were "reasonably and realistically callable for redemption" at the special call prices in the sense that holders of these bonds might reasonably anticipate calls prior to maturity at these prices. These special call prices were not "a mere sham" as contended by defendant in its brief, but were for a bona fide business purpose.

580

8. In 1952 the Commissioner sent the following ruling letter to a taxpayer:

"Gentlemen:

"Reference is made to your letter of November 1, 1952, referring to a ruling of the Bureau dated July 30, 1952, in which it was held that the earliest call date for Appalachian Electric Power Company bonds would be thirty days after notice of redemption is received, except that if no such notice has been received on the date the decision to amortize bond premium under section 125 of the Internal Revenue Code is made with respect to such bonds, the earliest call date would be thirty-one days after the date of such decision.

"The Appalachian Electric Power Company 3¾% bonds, 1981 Series, are callable in whole or in part through May of 1953 at 105⅝. They are also callable for sinking fund through funds derived from maintenance or sale of property at any time upon thirty days notice through May 31, 1954 at 102⅜. You request to be advised whether the above-mentioned ruling of July 30, 1952, means that such bonds may be amortized down to 102⅜ or whether it means that they can only be amortized down to 105⅝ through May of 1953.

"Upon the basis of the information on file in this office, it is the opinion of this office that a taxpayer electing to amortize the premium on Appalachian Electric Power Company bonds in accordance with section 125 of the Code may use the regular redemption price of 105⅝ or the special redemption price of 102⅜.

"Very truly yours,

"Norman A. Sugarman, Assistant Commissioner

"By (signed) H. T. Swartz

"Head, Technical Ruling Division"

In 1956 the ruling was revoked by the following letter:

"Gentlemen:

"Reference is made to our letter dated December 2, 1952, in which you were advised that a taxpayer electing to amortize the premium on Appalachian Electric Power Company bonds in accordance with section 125 of the Internal Revenue Code of 1939 may use the regular redemption price of 105⅝ or the special redemption price of 102⅜.

"The question of the redemption price to be used has been reconsidered, and it is now the conclusion of this office that the bond premium under section 171 of the 1954 Code (section 125 of the 1939 Code) on an earlier (than maturity) call date basis should not be computed, with respect to the above-mentioned bonds, with reference to the special redemption prices set forth in the prospectus thereon, except as to any particular bonds or portion thereof with respect to which actual notice of call on a specific or ascertainable date has been issued, but should be made with reference to the general redemption prices set forth in the prospectus.

"Accordingly, the ruling contained in our letter dated December 2, 1952, is hereby revoked.

"Pursuant to authority contained in section 7805(b) of the 1954 Code, this ruling will not be applied with respect to bonds purchased by you prior to the date of this letter.

"Very truly yours,

"(Signed) Russell C. Harrington Commissioner"

Similar rulings had been made in 1952 with respect to certain bonds of Hartford Electric Light Company and Chesapeake & Ohio Railway Company, and were likewise revoked on March 22, 1956, "to the extent that * * * [they] were interpreted as meaning that the special redemption price could be used * * *" None of these rulings were published, but were produced by the defendant in response to interrogatories filed by plaintiff in this case. They are relevant only

as indicating the Commissioner's earlier administrative construction of his own regulations with respect to what was a reasonable method of determining the amount of bond premium to be amortized.

9. The Appalachian bonds involved in the Parnell case were sold in 1953 at a profit, and a tax paid on the capital gain. The adjustment made by the Internal Revenue Service for the year 1952 in disallowing the deduction of the difference between the special call price and the general call price of these bonds automatically required a corresponding adjustment in the capital gain realized in 1953, with a resulting overassessment in favor of plaintiffs. The defendant has filed a counterclaim asking that this 1953 adjustment be reversed in the event of a decision for the plaintiffs. In the Reed case, it appears that plaintiffs had purchased other bonds in 1953 and had employed the same method of amortizing bond premium, and that the Commissioner of Internal Revenue asserted a deficiency in 1953 with respect to which the plaintiffs are seeking a redetermination in the Tax Court. These bonds were sold in the year 1954, and in computing the 1954 deficiency the Internal Revenue Service adjusted the capital gains in favor of the plaintiffs. The defendant seeks a reversal of these adjustments in the event of a decision for the plaintiffs.

10. Plaintiffs in each case filed a timely claim for refund setting forth the grounds subsequently relied upon in their respective complaints. These claims for refund were disallowed prior to the filing of the respective actions.

### Conclusions of Law

1. The Court has jurisdiction over this case by virtue of 28 U.S.C. § 1346 (a) (1).

█ 2. Plaintiffs were entitled to the deductions taken on their respective tax returns for amortization of bond premium pursuant to Section 125, Internal Revenue Code of 1939, in the Parnell case, and Section 171, Internal Revenue Code of 1954, in the Reed case. Cf.

Commissioner v. Korell, 1950, 339 U.S. 619, 70 S.Ct. 905, 94 L.Ed. 1108.

█ 3. Judgment shall be entered in favor of the plaintiffs in each case. In the Parnell case judgment for the defendant shall be entered on its counterclaim for the year 1953. In the Reed case, the judgment shall be without prejudice to the right of the defendant to assess and collect from the plaintiffs the amount of the 1954 adjustment in capital gains taxes in the event the final decision of the Tax Court is that plaintiffs were entitled, under Section 125, Internal Revenue Code of 1939, to the full deductions taken on their returns for the year 1953 which is before the Tax Court. Plaintiffs in each case shall recover the interest assessed against them and paid, together with interest on the respective items of recovery as provided by law, and allowable costs.