T. M. EVANS and Josephine S. Evans, Plaintiffs,

v.

Alexander J. DUDLEY, individually and as Former District Director of Internal Revenue, Defendant,

United States of America, Intervenor.

Civ. A. No. 16602.

United States District Court
W. D. Pennsylvania.

Sept. 20, 1960.

John A. McCann, Pittsburgh, Pa., and Kirkpatrick, Pomeroy, Lockhart & Johnson, Pittsburgh, Pa., for plaintiff.

Hubert I. Teitelbaum, U. S. Atty., Pittsburgh, Pa., for defendant.

GOURLEY, Chief Judge.

In this non-jury proceeding in which the taxpayer seeks the recovery of certain of his 1954 income taxes allegedly erroneously assessed and collected by the District Director, the United States has filed a counterclaim which poses the focal legal questions for this court's determination.

1. May the Commissioner of Internal Revenue disallow on audit a deduction for bond premium amortization as to bonds purchased in 1954 where express statutory authority exists for such deduction under 26 U.S.C.A. § 171 based upon the thesis that the taxpayer has received a deduction on said bonds under the charitable contribution provisions of the Internal Revenue Act.

2. In the event that it is concluded that the Commissioner's disallowance of the bond premium amortization deduction was improper, should the allowable bond premium be computed based on the general or special call prices?

For purposes of simplification I shall allude throughout this opinion, in the singular, to the taxpayer, T. M. Evans, in view of the fact that all transactions were admittedly conducted by him, although the complaint is brought by T. M. Evans and his wife, Josephine S. Evans, since the income tax return upon which suit is predicated was filed as a joint husband-wife return.

The taxpayer's complaint requested relief with respect to increasing allowance for fair market value of the equity in bonds to which he was entitled as a charitable contribution in his tax return for the year 1954, and with respect to the amount of a claimed casualty loss resulting from a hurricane to taxpayer's summer home located at Fishers Island, New York.

In view of the uncontested testimony as to the values of the securities deductible as a charitable contribution and stipulated agreement rendered during trial between the taxpayer and the government, as to the casualty loss experienced, the court entered final orders on these issues and accordingly they require no further consideration.

I shall, therefore, direct myself entirely to the issues raised by the governments' counterclaim as to the correctness of the bond premium amortization deduction.

On October 15, 1954, taxpayer bought $1,300,000 face amount of public utility bonds at a premium. On October 18, 1954, he bought an additional $700,000 face amount of similar bonds, all bonds were issued prior to January 22, 1951. The total cost to the taxpayer of the bonds so purchased, including commissions and other charges was $2,227,930.-96. Being public utility bonds they were so called callable bonds, being subject to redemption at any time upon thirty days' notice at a lower price than the purchase price known as the call price. The premium paid on acquiring the bonds, i. e., the amount paid for the bonds in excess of their call prices, was $182,420.

All of these public utility bonds were purchased through the First Boston Corporation, a national brokerage house having an office in Pittsburgh, Pennsylvania. The taxpayer had previously dealt with them to a substantial extent in connection with his extensive market operations. In order to pay for the public utility bonds the taxpayer advanced $118,000 of his own money and borrowed $2,109,930.96 from Mellon National Bank and Trust Company.

The taxpayer on November 19, 1954, donated $1,250,000 face amount of these bonds, $700,000 to Yale University and $550,000 to the T. M. Evans Foundation. (Substantial gifts to both of these charities were made by taxpayer both prior to and subsequent to the above transactions.) In March and May of 1955, taxpayer donated the remaining $750,000 of these bonds to the T. M. Evans Foundation.

Under the terms of his deeds of gift of the bonds, Yale University and the T. M. Evans Foundation, respectively, at the time of the gifts accepted the bonds and agreed to assume and pay the outstanding indebtedness relating to the bonds which the taxpayer had incurred in purchasing them.

Taxpayer, in his federal income tax return for the year 1954 took a deduction under 26 U.S.C.A. § 171 of the Internal Revenue Code of 1954, in the amount of $170,500 by way of amortization of the premium paid on the acquisition of the bonds. The amount was calculated as being the difference between the prices paid and the call prices at the earliest call dates. In addition taxpayer claimed a deduction for the charitable contribution of his equity in the face amount of the bonds.

In short, taxpayer was able to secure what amounted to a double deduction under the Revenue Law, first by invoking the amortization provision of the Act, and second by taking a deduction under the charitable contribution provisions of the Act.

It is not in dispute that taxpayer had engaged in security transactions on a large scale both prior and subsequent to this transaction, nor was anything unusual, irregular, or not in accordance with established practice. The taxpayer admittedly states that based upon information which he gleaned from financial publications and upon consultation with counsel he purchased the utility bonds with the view of taking advantage of tax benefits available under the

amortization provisions of the Revenue Act as well as the deduction to which he would be entitled in making a charitable contribution, together with a full recognition of the risk of loss or benefit from any decline or advance in the market value which might accrue.

## I.

The government contends that the taxpayer should not be entitled to bond premium amortization under 26 U.S.C.A. § 171 where he secures the equivalent of the benefit as a charitable contribution. The government categorically admits that the taxpayer had he not made a charitable contribution of the bonds, would have been entitled to obtain the bond premium amortization. Thus, had the taxpayer contributed to the charitable purposes in cash or other securities, the utility bonds would have been a proper subject for amortization.

In short, the government advances the proposition that an otherwise allowable deduction should not be permitted if the taxpayer, on entering into a transaction, is motivated by the tax advantage to be gained rather than by a commercial or industrial purpose. In this connection they rely upon Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596.

The cases which have applied the rules enunciated by this authority essentially were transactions which constituted a sham or use to evade tax responsibility. The purchase of bonds by the taxpayer, unlike the transactions relied upon by the government, was a real and legitimate purchase, in the open market at arms length with outstanding financial institutions resulting in an appreciable change in the taxpayer's financial position.

Thus, in each of the cases where the Tax Court concluded that a commercial or industrial purpose was lacking, it was concluded that the prices were artificial or that they resulted from transactions involving clients of the same promoters or finders and thereby having the indicia of unreality, John Fox 17 TCM 1006; Maysteel Products, Inc., 33 T.C. ——; Fabreeka Products Co., 34 T.C. 30; Jack L. Sherman, 34 T.C. ——; Sadie S. Friedman, 34 T.C. ——.

The purchase of bonds by the taxpayer, unlike the transactions relied upon by the government, was a real and legitimate purchase in the open market at arms length with outstanding financial institutions, resulting in an appreciable change in the taxpayer's financial position.

■ This Circuit has recognized that motive of tax avoidance, in itself, may not be considered in determining the incidence of taxation, Weller v. Commissioner, 3 Cir., 270 F.2d 294. It appears self-evident that this court is without power to conclude as a matter of law that the provisions of 26 U.S.C.A. § 171 do not have application to any security which might fall within the terms and provision thereof, merely where the taxpayer uses that security for any other purpose for which he is entitled to a deduction under any other provisions of the Internal Revenue Code.

■ The government inferentially is suggesting that this court is empowered to legislate on what appears to be a loophole in the law permitting a double deduction. Such power rests with Congress and not the courts. It is not my province to add an additional requirement for securing the bond amortization premium that it be confined only to circumstances where one deduction is sought, when Congress did not impose such restrictive terms.

General equitable considerations do not control the measure of deductions or tax benefits. It is as applicable to the government as the taxpayer. Congress may be strict or lavish in its allowance of deductions or tax benefits. The formula it writes may be arbitrary and harsh in its applications. But, where the benefit claimed by the taxpayer is fairly within the statutory language and the construction sought is in harmony with the statute as an organic whole, the benefits will not be withheld from the taxpayer though they represent an unexpected windfall, Lewyt Corp. v. Commissioner, 349 U.S. 237, 240, 75 S.Ct. 736, 99 L.Ed. 1029.

It is clear that a court cannot impose equitable considerations in controlling the measure of deductions or tax benefits. This court is not empowered to legislate or impose restrictive conditions which are not present in the law, Royer's, Inc. v. United States, 3 Cir., 265 F.2d 615.

Thus we are faced with the dilemma, frequently arising in the complexities attendant to tax litigation, of traversing the twilight zone of resolving two conflicting and antithetical propositions: the precept that the court cannot impose restrictive conditions not present in the purview of the law, on the one hand, as distinguished from the rule that the courts cannot give tax benefits to a transaction, without business or commercial purpose, motivated for tax avoidance reasons.

■ It is settled law, and agreed by the parties, that the burden of proof to establish the deduction must rest with the taxpayer. It is my judgment that the taxpayer has met this burden.

An examination of the facts does not lend any support to the contention that taxpayer was not a bona fide holder of the bonds. He purchased them with his own cash and with cash borrowed with notes on which he incurred personal liability. Taxpayer was actively engaged in the purchase and sale of large amounts of stock, bonds and other securities. The purchase of the bonds involved in this case was not an unusual transaction for either taxpayer or his lending Bank.

After the purchase and until the later disposition of the bonds taxpayer had substantially all the incidents of ownership, including the following:

a. Risk of loss in the event of a decline in the market value.

b. Full benefit from any advance in the market value.

c. Right to enjoy the income from the bonds.

d. Right to dispose of the bonds by sale or gift or to continue holding them.

During that time he had outstanding no commitment either to sell or to give the bonds.

The two deductions are based on unrelated principles and the amount of one is not dependent upon the other.

While an intention to allow one expenditure to be deducted twice under a single statutory provision will not be imputed to Congress, a double tax benefit is obtainable from a single cash outlay under different sections of the law unless Congress has indicated that one or the other shall be inapplicable, Helvering v. Highland, 4 Cir., 124 F.2d 556; Adams v. Commissioner, 8 Cir., 110 F.2d 578; Laughlin's Estate v. Commissioner, 9 Cir., 167 F.2d 828; American Water Works Co., Inc. v. Commissioner, 2 Cir., 243 F.2d 550.

The Internal Revenue Code is replete with instances where Congress has stepped in to outlaw particular double deductions and benefits. The relief, therefore, which the United States is seeking to sustain a disallowance of this nature must necessarily rest with the Congress and not the courts.

■ Cognizant of the well-recognized doctrine that a taxpayer need not organize his affairs so as to produce the maximum tax, and recognizing that taxpayer's transaction possessed substance, as distinguished from a mere sham for tax avoidance purposes, having a business or commercial purpose, I must conclude that the instant transaction has been conducted within the purview of 26 U.S.C.A. § 171 and is deductible under the bond premium amortization provision of said Act.

II.

In determining the amount of the bond premium the taxpayer computed the difference between the purchase price of the bond and the lowest price at which the bond could be called on the earliest call date, such price being the "special" call price. The government contends that the "special" call price provided for in the bonds was not reasonable within the meaning of the statute and that the amount of the bond premium should have

been determined by the taxpayer with reference to the "general" call price provided for in the bonds.

The government presents the thesis that the "special" call price may only be used if there is a reasonable advance ascertainment of the date of call.

The government's argument would place a limitation on the deduction for amortizable bond premium which finds no sanction in the statute. Thus, the statute says " * * * the amount of the amortizable bond premium for the taxable year shall be allowed as a deduction." It defines the amount of amortizable bond premium as the difference between basis and the amount payable " * * : * on maturity or on *earlier call date*." 26 U.S.C.A. § 171(b)(1)(B) (Emphasis supplied.)

Nor does this limitation find any sanction in any judicial precedent. Commissioner v. Korell, 339 U.S. 619, 70 S.Ct. 905, 94 L.Ed. 1108.

It is noteworthy that the Commissioner of Internal Revenue issued a series of rulings in 1952 and 1954 which provided that taxpayers should base their amortization deduction on the "special," or lower, call price. Rev.Rul. 56–398, 1956–2 Cum.Bul. 984. It was not until 1956 that these rulings were reversed.

█ I am well aware that these rulings of the Commissioner do not bind the court, since the taxpayer admittedly was not aware of their existence and accordingly placed no reliance upon them. But, I do believe that they are relevant to demonstrate expertise interpretation of the statute and may be considered in evaluating congressional intent.

It is a common practice in issuing debentures and bonds secured by the pledge of real estate to set forth two series of call prices at which the bonds may be redeemed. These two call prices perform different functions.

The "special" call price is a price at which bonds may be redeemed with moneys the borrower deposits with the trustee under certain provisions of indenture. Generally, these moneys include the sinking fund deposits, the maintenance fund deposits and the deposits made against the release of property, each of which are designed to provide additional security for the holder by effecting redemptions prior to maturity, or in the alternative, by compelling the borrower to increase the value of the collateral securing the loan.

In addition, these funds serve the purpose of permitting the borrower to utilize the funds which he is required to deposit. The redemption premium is designed to provide the holder a modest reimbursement for the expense and delay he will incur in reinvesting the proceeds.

On the other hand, other provisions of the indenture are designed to permit borrowers to redeem at their discretion all, or a part, of their outstanding bonds in order to permit the borrowers to refund their debt when there is a decrease in the going rate of interest. Since the exercise of this privilege will deprive the holders of a more favorable return of interest, the redemption price provided in this connection (the "general" call price) serves a dual purpose. It must be high enough to make a refunding economically advantageous to the borrowers only when the change in interest rate is substantial, thus protecting the holder from a refunding upon an ordinary fluctuation in the effective interest rate, i. e., in the market value of the bonds; it must also be high enough to compensate the holders in part for the loss of annual interest which they will suffer upon reinvesting their proceeds in a less favorable market. Thus the terms "general" and "special" refer to the nature of the call which customarily accompanies a redemption at these prices, not to some esoteric concept that might seem to make the former more "normal" as a limiting factor in the determination of the amount of the amortization than the latter.

█ I can only conclude that Congress at the time that the 1954 Amendment to the Statute was considered, recognized the economic realities with reference to the bond market generally, and cognizant

that "special" calls constituted the practice in the redemption of public utility bonds during this period, Congress in the enactment of the Internal Revenue Code of 1954, limited said privilege, which limitation, however, did not have application to the dates of issuance of utility bonds purchased by the taxpayer.

I am satisfied that the method employed by the taxpayer by invoking the "special" call price is authorized by the applicable statutes when construed in view of their wording and legislative history. Parnell vs. U. S., 58–2 U.S.T.C. par. 9881; Findings of Fact and Conclusions of Law at 187 F.Supp. 576, affirmed without opinion, 6 Cir., 272 F.2d 943.

This opinion, together with stipulations of the parties, shall constitute findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure, 28 U.S.C.A.

An appropriate order is entered.