289 F.2d 69
 ESTATE of A. GOURIELLI, Deceased, The Hanover Bank, Executor, and Helena Gourielli, Surviving Wife, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Jacob A. and Bertha L. GOLDFARB, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 No. 239.
 No. 164.
 Docket 26258.
 Docket 26324.
 United States Court of Appeals Second Circuit.
 Argued March 7, 1961.
 Decided April 13, 1961.
 
 David Alter, New York City (Squadron, Alter & Weinrib, and Hubert Thurschwell, New York City, on the brief), for petitioners Estate of Gourielli, et al.
 Theodore Tannenwald, Jr., New York City (Weil, Gotshal & Manges, and Martin D. Ginsburg, New York City, on the brief), for petitioners Jacob A. and Bertha L. Goldfarb.
 James P. Turner, Atty., Dept. of Justice, Washington, D. C. (Abbott M. Sellers, Acting Asst. Atty. Gen., and Lee A. Jackson, Melva M. Graney and John A. Bailey, Attys., Dept. of Justice), Washington, D. C., for respondent in both cases.
 Before LUMBARD, Chief Judge, and WATERMAN and FRIENDLY, Circuit Judges.
 FRIENDLY, Circuit Judge.
 
 
 1
 The issue in these two cases is whether, in a tax year, 1953, governed by §§ 23(v) and 125, added to the 1939 Code by the Revenue Act of 1942, c. 619, § 126, 56 Stat. 798, 822, taxpayers who purchased bonds callable on 30 days' notice may deduct, in addition to the excess of their basis over the redemption price at which the issuer could freely call all or any part of the issue, the excess of that price over a lower one at which the issuer could call bonds only out of specially defined funds. In both cases the Tax Court sustained determinations of the Commissioner adverse to the taxpayers. We likewise hold the additional deductions claimed by the taxpayers may not be taken on the facts here. We set forth the relevant sections of the Code in the margin;[1] we shall follow the parties, and the bond indentures, in referring to the higher of the two prices as a "general" or "regular" redemption price, and to the lower as a "special" redemption price.
 
 
 2
 In October, 1953, Mr. and Mrs. Gourielli purchased $540,000 principal amount of Appalachian Electric Power Company 3¾% bonds, issued in 1951 and due in 1981, at 117½; the bonds were retained for somewhat over 30 days and then were sold at 115½. The 1981 series was an issue of $17,000,000 out of a total of $157,000,000 outstanding under the same mortgage at the date of the purchase. During the Gouriellis' ownership, the bonds were stated to be subject to call on 30 days' notice at 1053/8 or, out of certain funds hereafter described, at 102 3/8. The taxpayers claimed a deduction for amortization of bond premium of $83,056.07, representing the excess of the cost of the bonds over what would have been received if these had been called at the "special" redemption price of 102 3/8; the amortization resulted in the transaction's yielding a short term capital gain. The Commissioner allowed a deduction only of $64,831.07, the excess of the cost of the bonds over what would have been received at the "regular" redemption price of 105 3/8.
 
 
 3
 In late November, 1953, Mr. Goldfarb purchased $500,000 principal amount of Arkansas Power & Light Company 4¼% bonds, issued in 1953 and due in 1983, at an average price of approximately 110½. The 1983 series was an issue of $18,000,000 out of a total of $104,200,000 outstanding under the same mortgage at the date of the purchase. At the time the bonds were stated to be subject to call on 30 days' notice at 105.36 or, out of certain funds hereafter described, at 101.36. Mr. Goldfarb claimed a deduction for amortization of bond premium of $47,175, representing the excess of the cost of the bonds over what would have been received if they had been called at the "special" redemption price of 101.36. The Commissioner allowed a deduction only of $27,175, the excess of the cost of the bonds over what would have been received at the "general" redemption price of 105.36. The bonds were sold in June, 1954, for $526,125; petitioners reported a long term capital gain.
 
 
 4
 In both cases the company's right to redeem the bonds on 30 days' notice, in whole or in part, at the "regular" price was unconditional; in both, the right to redeem at the "special" price was limited to the application to that end of certain funds narrowly defined in the indentures. In both, also, when less than an entire series was to be called, the bonds to be redeemed were to be determined by lot.
 
 
 5
 The Appalachian bonds held by the Gouriellis were redeemable at the "special" price only "by the use or application of cash deposited pursuant to Section 20 or Section 40 of the Mortgage or by the use of proceeds of released property or the proceeds of insurance." Section 20 of the Mortgage required the company, on or before March 1 of each year, beginning with 1953, to deliver to the mortgage trustee an amount in cash or principal amount of bonds of the 1981 Series equal to 1% "of the greatest principal amount of bonds of the 1981 Series theretofore at any onetime outstanding," less credits of 60% of the cost or fair value of any property additions and of 100% of the principal of any bonds which the company would have been entitled to issue, under a provision permitting such issuance in an amount not exceeding 70% of the cost or fair value of property additions, but had elected not so to issue. Any cash so paid might be withdrawn upon certification that the company was entitled to issue bonds and had waived its right to do so, or, at the direction of the company, might be used for the purchase or redemption of bonds of the 1981 Series. Section 40 provided that, within four months after the close of each calendar year, the company would furnish the mortgage trustee with a certificate showing whether its expenditures for repairs, maintenance or replacement of the mortgaged property and credits claimed for property additions were more or less than specified percentages of operating revenues; if less, the company was to deposit an amount in cash or bonds equal to the deficiency. The company could withdraw any cash or bonds so deposited against an excess shown in a subsequent certificate; it could withdraw cash against the deposit of bonds at any time; and it also had the same rights with respect to the cash as have been described in the case of Section 20, the purchase or redemption of bonds being here permitted without segregation as to series. This latter right existed also as to cash paid to the trustee as insurance proceeds or for the release of property. Up to the fall of 1953 no cash had ever been paid the trustee pursuant to Section 20 or Section 40, the company's obligations under these sections having been satisfied by credits for property additions. Neither had anything been paid as insurance proceeds. Certain amounts had been paid in connection with the release of property but all these save $184,837.43 had been withdrawn. There is no evidence that any substantial payments for insurance or the release of property were in prospect. It would have been extremely poor business for the company to incur the expenses incident to a call for such a small sum as was available; the chance that the company would engage in so ill-advised an endeavor during petitioners' brief ownership was thus exceedingly remote; and the hazard that any significant number of petitioners' bonds would be called during that period was infinitesimal.
 
 
 6
 The Seventh Supplemental Indenture under which the Arkansas Power & Light Company bonds of 1983 were issued provided these could be redeemed at the "special" price only out of "cash delivered to or deposited with the Corporate Trustee pursuant to the provisions of Section 39 or Section 64 of the Mortgage or of Section 2 hereof or Section 3 of the Third Supplemental Indenture or with the proceeds of Released Property." Section 39 of the Mortgage as modified by Section 3 of the Third Supplemental Indenture required that, within 90 days after the close of the calendar year, the company should file a certificate in regard to maintenance and in case of a deficiency make a payment in cash, on lines broadly similar to these described above in connection with the Appalachian mortgage. Cash so paid might be withdrawn against property additions or waiver of the right to issue bonds to which the company was entitled, or might be directed to be applied to the purchase or redemption of bonds; the trustee was so to apply any cash left with it for five years. Section 64 provided for the payment to the corporate trustee of sums received as the result of the taking of property by eminent domain or its sale to governmental bodies. Section 2 of the Seventh Supplemental Indenture provided that, on or before October 1 of each year beginning with 1954, the company was to deliver to the trustee a certificate showing the greatest principal amount of bonds of the 1983 Series outstanding at any one time prior to January 1 of such year, less the amount retired by application of the proceeds of insurance, the release or other disposition of property, or the taking of property by eminent domain, and less also the principal amount of bonds the right to the issuance of which had been waived pursuant to certain clauses of the mortgage. Along with the certificate the company was to pay, in cash or 1983 bonds, 1% of this balance, less the principal amount of any bonds which the company had the right to issue on the basis of property additions or retirement of 1983 bonds, if the company elected to waive its right to issue such bonds and thereby avail itself of this credit. Section 2 contained a provision permitting the company to anticipate these sinking fund requirements; however, if cash were so paid, bonds called for redemption prior to January 1 of the calendar year in which the payment would otherwise have become due would be redeemable at the "general" rather than the "special" redemption price. In fact, during 1953 the trustee under the Arkansas Power & Light Co. mortgage held no cash under any of these provisions, with respect to either the 1983 series or any other, and there is no evidence that any receipts were in prospect. The company had satisfied its covenant under the maintenance clause; no property had been taken by governmental bodies; nothing had been paid for released property; and the company had availed itself of the credit to eliminate its obligation to pay cash or bonds into the sinking funds for earlier series, no sinking fund obligation with respect to the 1983 series having yet accrued. When the Arkansas bonds were purchased by Mr. Goldfarb in late November, 1953, there was thus no real possibility that any of them would be called at the "special" price that year.[2] On April 18, 1955, the entire issue of 4¼s of 1983 was called at the "general" redemption price, then 105.18.
 
 
 7
 Despite superficial similarity in language, the two redemption provisions serve entirely different purposes and have quite different effects. The primary purpose of the provision giving the right to call all or part of the issue at any time is to enable the company to take advantage of a fall in interest rates; the relatively high premiums demanded on such a call, initially 5¾% on the Appalachian bonds and 5.36% on the Arkansas, reflect the lenders' determination to exact a substantial price for something that will deprive them of the benefit of what has proved an advantageous bargain. Dewing, The Financial Policy of Corporations (5th ed. 1953), Vol. I, pp. 187-88. In contrast, the so-called "special" redemption price is an incident, itself unfavorable but only mildly so, in a set of provisions requiring the company to protect the underlying security for the benefit of the lenders — by adequately maintaining the mortgaged property, by conserving the proceeds of property destroyed or sold, and by providing against the ravages of time either through adding new property or through retiring bonds. Although the company is given considerable flexibility in providing this protection by means other than the payment of cash and even is entitled under some circumstances to withdraw cash already paid to the trustee, there is always a possibility that the payment of cash will be the only option attractive to the company from a business standpoint; hence the borrower insists upon a right to call in order to avoid the accumulation of idle cash in the sinking fund or the payment of what it deems an excessive price for the purchase of bonds from unwilling sellers. See Dewing, supra, at pp. 247-49. Lenders are willing to permit the company to do this at a price lower than in the general redemption clause,[3] since, even in the event, not generally anticipated in public utility bonds, that the company should elect the cash option, the careful definition of the funds that may be so applied severely limits the amount of bonds that can be called, especially during the early life of the issue when the point is of greatest concern, and the consequent risk to the lenders — save for the eventualities, themselves rare, that a large part of the mortgaged property might be destroyed or condemned. Moreover, for reasons that are sufficiently apparent, there is not the same likelihood of exact correlation between a decline in interest rates and a call at the "special" as at the "general" redemption price. By the same token, although the "general" redemption provision normally tends to prevent the market price of the bond from rising too markedly above the call price, since the very existence of such a premium usually shows that interest rates have fallen to a point producing the hazard of a call,[4] the "special" redemption provision exercises no downward pull of similar magnitude in the usual case, since, if any such call were to be made, it would relate in any year to only a small proportion of the bonds, chosen by lot.
 
 
 8
 We do not think that when Congress provided in § 125 of the Code that the amount of bond premium "shall be determined * * * with reference to the amount payable on maturity or on earlier call date," and allowed the deduction as "amortizable bond premium" in any year of "the amount of the bond premium attributable to such year," it meant to include an amount payable on a call at a "special" price of which there was no real possibility during the period for which the amortization is being taken and the deduction claimed. The statute does not say the premium is the excess of the basis over "the amount payable on maturity or on earlier call date"; it says the premium shall be determined "with reference to" the two factors. One purpose for using this somewhat oblique language was to encompass the adjustments for unamortized bond premium referred to in the clause immediately following, see Regulations 118, § 39.125(b)-1, but that may not have been the only purpose. A sufficient chink was left to give scope for interpretation, as, indeed, there might well have been without this, for even the words "earlier call date" would call for construction. Ozawa v. United States, 1922, 260 U.S. 178, 194, 43 S.Ct. 65, 67 L.Ed. 199.
 
 
 9
 We know that Section 125 was added to the Code because "The want of statutory recognition of the sound accounting practice of amortizing premium leads to incorrect tax results * * *" 77th Cong. 2d Sess., H.R.Rep. No. 2333, p. 47 (1942-2 Cum.Bull. 372, 410). Taxpayers have cited no authority that it is sound accounting practice to provide, within 30 days after acquiring a bond, a reserve large enough to meet not only every risk of call that could eventuate during the amortization period but also one that could not. Cf. Massey Motors, Inc. v. United States, 1960, 364 U.S. 92, 104-106, 80 S.Ct. 1411, 4 L.Ed.2d 1592. Again the House Report tells us that lack of provision for amortization of bond premium had obliged bondholders to pay "a tax, as upon income, upon that portion of the so-called interest payments which is in reality capital recovered * * *". What this means is that an investor who pays $1,100 for a $1,000 5% uncallable bond maturing in ten years will not in fact receive $500 interest over the decade, but only $400, and only the latter should be taxed as income. Similarly, if the issue were callable at 105 on 30 days' notice in whole or in part at the company's option, the premium might indicate sufficient likelihood of a call that in substance the investor would be paying $1100 and be getting back $1050, and since there was no way of determining when this loss of capital would befall, Congress indulgently allowed him to provide for it at once. This reasoning scarcely applies to a provision entitling the issuer to call what normally is at most a small proportion of the issue each year — at least until the issuer's prospective intention and legal ability to exercise this privilege in a significant way become sufficient to constitute a market factor. Whether a bondholder might be entitled to use a "special" redemption price for computing bond premium if there were circumstances indicating the likelihood of a substantial call at that price when he first elected a method of amortization, or whether, having elected to amortize to a "general" call price, he might be permitted a further deduction for amortization if facts indicating the likelihood of such a call at the "special" price later appeared, we do not find it necessary here to decide.
 
 
 10
 Taxpayers seek to find support for a conclusion adverse to the Commissioner in a statement in the reports, quoted in the margin, 83d Cong. 2d Sess., H.R.Rep. No. 1337, pp. 26-27; Sen.Rep. No. 1662, pp. 30-31,[5] accompanying § 171 of the 1954 Code, which provided that henceforth amortization could be taken only to a call date more than three years after the date of issuance. Congress' awareness that the rapid amortization of a premium over the redemption price at an early call date, authorized by the 1942 amendment, had opened a loop-hole that needed to be narrowed,[6] hardly shows it had initially meant to create an even larger one. Neither are we persuaded to these taxpayers' views by the Commissioner's having at one time advised other taxpayers that use of the "special" call price was permissible, in unpublished opinions later revoked by Revenue Ruling 56-398, 1956-2 Cum. Bull. 984-987;[7] such opinions are not binding elsewhere, Goodstein v. C. I. R., 1 Cir., 1959, 267 F.2d 127, 132; Weller v. C. I. R., 3 Cir., 1959, 270 F.2d 294, 298-299, certiorari denied, 1960, 364 U.S. 908, 81 S.Ct. 269, 5 L.Ed.2d 223. We realize also that our decision runs counter to at least the one of the two decisions reported sub nom. Parnell v. United States, D.C.M.D.Tenn.1958, 187 F.Supp. 576, affirmed 6 Cir., 1959, 272 F.2d 943, that relates to taxpayer Parnell's holding of the same issue of Appalachian Electric Power bonds as were brought by the Gouriellis, and to Evans v. Dudley, D.C.W.D.Pa.1960, 188 F.Supp. 9, now under appeal to the Third Circuit. Finally, we do not consider Commissioner of Internal Revenue v. Korell, 1950, 339 U.S. 619, 70 S.Ct. 905, 94 L.Ed. 1108, much relied on by taxpayers, to be at all controlling in their favor. That decision was concerned with the minuend in § 126, whereas our problem relates to the subtrahend. The Supreme Court was there persuaded, as we had been, 2 Cir., 1949, 176 F.2d 152, that references to convertible bonds in the legislative history precluded an interpretation excluding the portion of the purchase price paid for a conversion feature from the basis from which premium was computed. Congress responded by changing the statute almost immediately, Act of Sept. 23, 1950, c. 994, Title II, § 217(a), 64 Stat. 927, 941. To be sure, as is usual, the change was prospective only; but both the action of Congress and the legislative history[8] reaffirm the purpose to limit the deductions to cases where the amortization represented appropriate provision for prospective losses of capital that lie within the bounds of reasonable contemplation rather than, as claimed in Korell and here, to permit deductions where it does not.
 
 
 11
 Judgments affirmed.
 
 
 
 Notes:
 
 
 [1]
 "§ 23Deductions from gross income.
 "In computing net income there shall be allowed as deductions:
 * * * * *
 "(v) Bond premium deductions. — In the case of a bondholder, the deduction for amortizable bond premium provided in section 125. * * *
 "§ 125. Amortizable bond premium. * * *
 "(b) Amortizable bond premium. — Amount of bond premium. — For the purposes of paragraph (2), the amount of bond premium, in the case of the holder of any bond, shall be determined with reference to the amount of the basis (for determining loss on sale or exchange) of such bond, and with reference to the amount payable on maturity or on earlier call date, with adjustments proper to reflect unamortized bond premium with respect to the bond, for the period prior to the date as of which subsection (a) becomes applicable with respect to the taxpayer with respect to such bond. In no case shall the amount of bond premium on a convertible bond include any amount attributable to the conversion features of the bond.
 "(2) Amount amortizable. — The amortizable bond premium of the taxable year shall be the amount of the bond premium attributable to such year.
 "(3) Method of determination. — The determinations required under paragraphs (1) and (2) shall be made —
 "(A) in accordance with the method of amortizing bond premium regularly employed by the holder of the bond, if such method is reasonable;
 "(B) in all other cases, in accordance with regulations prescribing reasonable methods of amortizing bond premium, prescribed by the Commissioner with the approval of the Secretary."
 
 
 [2]
 The stipulation of facts in the Goldfarb case recites that if Arkansas Power & Light Company had exercised certain options:
 "it could have made available sufficient cash in the maintenance and replacement fund (or to the extent permitted pursuant to Article 2, Section 2 of the Seventh Supplemental Indenture in the sinking and improvement fund of the Arkansas 4¼% bonds) or, if certain events had transpired, there might have been available sufficient cash in the released property fund or in the eminent domain fund which could have permitted the Company to redeem the Arkansas 4¼% bonds pursuant to the terms of mortgage and Deed of Trust and Supplemental Indentures thereto and which could have resulted in the redemption at the special call price prior to December 31, 1953, of all of the bonds of the Company having a face value of $500,000.00 owned by petitioner Jacob A. Goldfarb."
 We read this to mean only that the company had resources sufficient to enable it to make required payments in cash rather than otherwise — not that the indenture entitled it to pay cash in any amount it chose and avail itself of the "special" redemption price. The indenture gave the company no right to anticipate anything save sinking fund payments, and that right was carefully hedged as regards redemption price as noted in the text; although the company could have paid any amount it chose, no 1983 bonds could have been called at the "special" redemption price in 1953 since no sinking fund payment was due that year. If the quoted language from the stipulation means otherwise, we must disregard it in favor of the controlling provisions of the indentures, which were annexed, National Marking Mach. Co. v. Triumph Mfg. Co., 8 Cir., 1926, 13 F.2d 6, 9-10; Daugaard v. Hawkeye Security Ins. Co., 8 Cir., 1956, 239 F.2d 351, 354.
 
 
 [3]
 For the Appalachian bonds the initial special redemption premium was 2 3/8%, for the Arkansas bonds only 1.36%. Both the general and special redemption premiums were to decline as the years passed, the two meeting in 1977 in the case of the Appalachian issue
 
 
 [4]
 We say "normally" and "usually" since there was evidence that the large premium over the general redemption price commanded by the bonds herein question in the closing months of 1953 was not unrelated to a demand arising from their attractiveness for tax deduction purposes — even on the narrower view as to the permissible deduction conceded by the Commissioner
 
 
 [5]
 "Amortization of premium on callable bonds (sec. 171)
 "Under existing law, a bond premium may be amortized with reference to the amount payable on maturity or on earlier call date, at the election of the taxpayer. In the case of bonds with a very short call feature, such as those providing for call at any time on 30-day notice, the entire premium may be deducted in the year of purchase.
 "This provision has given rise to tax-avoidance opportunities. Substantial bond issues have been made subject to a 30-day call, permitting the purchaser to take an immediate deduction for the entire premium against ordinary income. Where the call feature is nominal or inoperative this permits a deduction for an unreal loss, since the market value of the bonds ordinarily remains fairly stable over considerable periods."
 
 
 [6]
 The 1954 attempt at narrowing was not effective since "taxpayers found they could accomplish much the same result as under the 1939 Code by using bonds with call dates slightly more than 3 years from the date of the issue of the bonds and by waiting until these bonds are 3 years old before buying or selling them." 85th Cong., 2d Sess., Sen.Rep., No. 1983 (1958), § 14. Accordingly the statute was further amended to provide that, for bonds acquired after December 31, 1957, the premium shall be determined "with reference to the amount payable on maturity (or if it results in a smaller amortizable bond premium attributable to the period to earlier call date, with reference to the amount payable on earlier call date) * * *". Technical Amendments Act of 1958, § 13(a), 72 Stat. 1606, 1610
 
 
 [7]
 The 1956 ruling permits use of the "special" redemption price "if an actual notice of call at the `special' redemption price on a specific or ascertainable date has been issued with respect to any particular bond or bonds, or portion thereof * * *"
 
 
 [8]
 "Section 125 was intended primarily to deal with the case where the premium was paid because the security bore a stated rate of interest higher than that prevailing in the current market for securities of a like risk and a similar life. Equity required the allowance of a deduction against ordinary income in cases of this sort." 81st Cong., 2d Sess., Sen. Rep. No. 2375, 2 U.S.Code Congressional Service 1950, p. 3101