Milton L. HALLE and Rachel N. Halle,
his wife, Appellants,

v.

UNITED STATES of America,
Appellee.

No. 9687.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 8, 1965.

Decided May 31, 1965.

Eugene H. Schreiber and Charles M.
Cahn, Jr., Baltimore, Md. (Blades &
Rosenfeld, Baltimore, Md. on brief), for
appellants.

Marco S. Sonnenschein, Atty., Dept. of
Justice (Louis F. Oberdorfer, Asst. Atty.
Gen., Lee A. Jackson and David O. Wal-
ter, Attys., Dept. of Justice, Thomas J.
Kenney, U. S. Atty., and Robert W. Ker-
nan, First Asst. U. S. Atty., on brief),
for appellee.

Before SOBELOFF and BOREMAN,
Circuit Judges, and HUTCHESON, Dis-
trict Judge.

BOREMAN, Circuit Judge.

Taxpayers,[1] Milton L. and Rachel N.
Halle, appeal from a judgment of the Dis-
trict Court denying them the claimed
right to recover income taxes plus in-
terest alleged to have been improperly
assessed and collected.[2]

The facts were stipulated in the lower
court. Prior to 1954 Halle had made
charitable contributions to Damil Foun-
dation, Incorporated (herein called the
Foundation), an exempt charitable cor-
poration. Interested in continuing the
donations, taxpayer was advised of the
tax benefits flowing from transactions in
which he engaged as hereinafter recited.
So minded, on November 24, 1954, Halle
purchased from Livingstone & Company,
a sole proprietorship, of Boston, Massa-
chusetts, Mississippi Power Company
bonds of the face value of $100,000 at a
price of $110,000, plus accrued interest.

1. Milton L. and Rachel N. Halle, his wife,
filed a joint return and so Mrs. Halle
is a party of record. The controversy
involves solely a transaction in which Mr.

Halle engaged. He is referred to, there-
fore, as the taxpayer or Halle.

2. For the District Court's opinion see
232 F.Supp. 462 (D.C.Md.1964).

of $500. The bonds had been issued prior to January 22, 1951, had a maturity date in 1979, were callable at 100½ at any time on thirty days' notice, and earned interest at three percent (3%) per annum. To purchase the bonds Halle borrowed $100,500, the call price of the bonds, from Guaranty Trust Company of New York. For this loan he gave his personal note and pledged as collateral security the bonds purchased and a cash deposit. Interest on the loan was payable at 3¼% per annum. The remainder of the purchase price, $10,000, was paid by Halle from his personal funds. Incident to and simultaneous with the purchase of the bonds, Halle obtained an irrevocable "put" option from Livingstone whereby the latter agreed to repurchase the bonds at any time before January 5, 1955, at a price of 108 plus accrued interest.

On December 28, 1954, thirty-four days after the date of purchase, Halle donated the bonds to the Foundation subject to the lien of $100,500 held by Guaranty Trust Company, at the same time assigning the irrevocable "put" option to the Foundation. On the following day, December 29, the Foundation exercised the option by selling the bonds to Livingstone at 108 plus accrued interest. On that day

Livingstone sent the Foundation a check for $8,181.33, the net proceeds due it from the sale. Of course, the Foundation discharged the bank's lien on the bonds and extinguished Halle's indebtedness to the bank.

Relying on section 171 of the Internal Revenue Code of 1954,[3] 26 U.S.C.A. § 171, Halle elected to amortize the bond premium of $9,500 (the difference between the purchase price of $110,000 and the call price of $100,500) to the nearest possible call date which was December 24, 1954, thirty days after the date of purchase. As a result of the transaction, on the federal income tax return for 1954 Halle claimed deductions for amortization of bond premiums of $9,500, interest expense of $500 and charitable contributions of $8,225. (The accuracy of the figures is not disputed.) Upon auditing the return the Internal Revenue Service allowed the deduction for charitable contribution but disallowed the deductions for interest expense and amortization of bond premium. Consequently, additional tax of $3,999.12, plus interest of $1,282.35, was assessed against the taxpayer. He paid these sums, filed his claim for refund which was denied and brought this action to recover the total. The District

3. The pertinent provisions of section 171 are as follows:

I.R.C. 1954

"§ 171. Amortizable bond premium

"(a) General rule.—In the case of any bond, as defined in subsection (d), the following rules shall apply to the amortizable bond premium (determined under subsection (b)) on the bond:

"(1) Interest wholly or partially taxable.—In the case of a bond (other than a bond the interest on which is excludable from gross income), the amount of the amortizable bond premium for the taxable year shall be allowed as a deduction."

\* \* \* \* \*

"(b) Amortizable bond premium.—

"(1) Amount of bond premium.— For purposes of paragraph (2), the amount of bond premium, in the case of the holder of any bond, shall be determined—

"(A) with reference to the amount of the basis (for determining loss on sale or exchange) of such bond,

"(B) with reference to the amount payable on maturity or on earlier call date (but in the case of bonds described in subsection (c) (1) (B) issued after January 22, 1951, and acquired after January 22, 1954, only if such earlier call date is a date more than 3 years after the date of such issue),

\* \* \* \*"

\* \* \* \* \*

"(2) Amount amortizable.—The amortizable bond premium of the taxable year shall be the amount of the bond premium attributable to such year. \* \* \*"

\* \* \* \* \*

"(d) Bond defined.—For purposes of this section, the term 'bond' means any bond, debenture, note, or certificate or other evidence of indebtedness, issued by any corporation and bearing interest \* \* \*."

Court upheld the disallowance of deductions of interest expense and bond premium amortization on the ground that the transaction was a sham. We think this was error.

The Government admits that this transaction meets the literal requirements of the provisions authorizing the deduction for amortization of bond premiums. It contends, however, that the transaction lies outside the plain intent of the statute because Congress in enacting section 171 intended that economic risk must be incurred before bond premiums could be so amortized, and in the case at bar the "put" option eliminated any "risk of loss." The District Court apparently agreed for it stated:

> "In the instant case the 'put' option protected taxpayer against the risk of loss from the possible call of the bonds, that is, the 'market reality' of which the applicable section of the Code 'takes cognizance'." (232 F.Supp. at 464).

In Industrial Research Products, Inc. v. Commissioner, 40 T.C. 578 (1963), the transaction, including a "put" option, was factually similar to that before us in the instant case. At page 587 the Tax Court stated:

> "Respondent [Commissioner] supports his present computation of the amount of the bond premiums by an argument that amortization of bond premium is limited to the amount of economic risk incurred and he argues that by reason of the put agreements petitioners incurred no economic risk greater than the difference between the bases of the bonds and the respective put prices. There is no merit in the argument. There is nothing in the statutes or in the legislative history of the pertinent sections which gives the slightest hint that the purpose of the legislation, allowing a bond premium deduction, is to allow a tax-free recovery of an amount that is subject to the risk of loss. In Hanover Bank v. Commis-

sioner, 369 U.S. 672 [82 S.Ct. 1080, 8 L.Ed.2d 187] the Supreme Court interpreted section 125 of the Internal Revenue Code of 1939 and reviewed its legislative history and subsequent amendments and also its earlier opinion interpreting the same statute in Commissioner [of Internal Revenue] v. Korrell, 339 U.S. 619 [70 S.Ct. 905, 94 L.Ed. 1108]. The purpose of this legislation is to allow the bond purchaser to recover a capital investment he makes in the form of the premium. * * * "

> "The fact that petitioners had a contract with their seller which might insulate them against loss in the event of a call, has no effect on the amortization of the bond premium. * * * " (Note: Section 125 of the 1939 Code was the forerunner of Section 171 of the 1954 Code.)

The Tax Court found nothing in either Hanover or Korell, in which the Supreme Court was considering and interpreting Section 125 of the 1939 Code, the forerunner of Section 171 of the 1954 Code here involved, which persuaded it that the deduction for amortization of the bond premium should be disallowed. The Government sought no review of the Tax Court's decision in Industrial Research.

Although the District Court stated and the Commissioner argues that the Tax Court in the above cited case had not considered the "sham" argument now advanced by the Government, it is clear from the briefs filed in the Tax Court that the Government did present the same arguments there as in the case at bar as to that portion of the amortized premium covered by the "put." This decision of the Tax Court, which the Government permitted to stand unchallenged, is the only one which has come to our attention where the purchaser of bonds sought to provide some measure of protection through an agreement on the part of the bond seller to repurchase the bonds within a specified time at a stipulated price if so requested.

In Hanover Bank v. Commissioner [4] and Commissioner of Internal Revenue v. Korell,[5] the Court undertook to review the legislative history of the then pertinent Code sections providing for income tax deductions of amortized bond premiums. From our examination of those cases, we conclude that the primary concern of Congress was to equalize taxes between owners of tax-exempt bonds and owners of taxable bonds; that Congress was legislating for the "generality of cases"; that it not only created a new deduction but also required that the basis be adjusted to the extent of the deduction allowable for taxable bonds and disallowable for tax-exempt bonds; that, even if Congress had expected that some loss of revenue to the Government might be entailed, it might have decided that more equal treatment of taxpayers was more important than possible revenue loss; that it could not be argued that Congress lacked the legislative discretion to have reached such a conclusion. In Hanover, the Court observed that a bond premium is the amount a purchaser pays in buying a bond in excess of the face or call value of the bond; that bond interest is taxable to the recipient and when a premium has been paid the actual interest is not a true reflection of the bond's yield but represents in part a return of the premium paid. " * * * It was to give effect to this principle that Congress * * * enacted Section 125 of the 1939 Code, which for the first time provided for amortization of bond premium for tax purposes." (369 U.S. at 677, 82 S.Ct. at 1083.) The Court recognized, just as the Government contended, that Section 125 had created a tax loophole of major dimensions but stated that the words used by Congress, taken in the light of pertinent legislative history, were binding. The Court concluded: " * * * Nevertheless, the

Government now urges this Court to do what the legislative branch failed to do or elected not to do. This, of course, is not within our province." (369 U.S. at 688, 82 S.Ct. at 1089.)

In the earlier case, Commissioner v. Korell (339 U.S. 619, 70 S.Ct. 905), to which the Tax Court referred also in Industrial Research, the taxpayer had purchased bonds at a premium which reflected the attractiveness of the convertible feature of the bonds rather than a high interest yield. The bonds were callable on thirty days' notice and the taxpayer amortized the premium accordingly and claimed the allowable tax deduction. There the Commissioner's contention was that Section 125, in establishing a deduction for "amortizable bond premium," did not include premium paid for the conversion privilege. In rejecting this contention, the Court observed that by "the clear and precise avenue of expression actually adopted by the Congress" (p. 625, 70 S.Ct. p. 908), the legislation was adopted with "no distinctions based upon the *inducements for paying the premium*" (p. 628, 70 S.Ct. p. 910, emphasis added). At pages 627–628, 70 S.Ct. at page 909 the Court said:

> " * * * We adopt the view that 'bond premium' in § 125 means any extra payment, regardless of the reason therefor, in accordance with the firmly established principle of tax law that the ordinary meaning of terms is persuasive of their *statutory* meaning." (Emphasis supplied.) [6]

In the Hanover case it is interesting that the Court pointedly noted the steps taken by Congress to plug loopholes created by the statutes authorizing amortization of bond premiums. The first step was as stated in our footnote 6. Next, in enacting Section 171 of the 1954

4. 369 U.S. 672, 82 S.Ct. 1080, 8 L.Ed.2d 187 (1962).

5. 339 U.S. 619, 70 S.Ct. 905, 94 L.Ed. 1108 (1950).

6. The decision in Korell led Congress to eliminate amortization of bond premiums attributable to a conversion feature. (Section 217(a) of the Revenue Act of 1950—64 Stat. 906.) But no further change was then made which reflected on the interpretation of Section 125 when it was again considered in Hanover Bank v. Commissioner (369 U.S. 672, 82 S.Ct. 1080—1962).

Code, Congress further narrowed the loophole by providing that the premium on callable bonds could be amortized to the nearest call date only if such date was more than three years from the date of the original issue of the securities and by making the provision applicable only to bonds issued after January 22, 1951, and acquired after January 22, 1954. "Finally, in 1958, by adoption of Section 13 of the Technical Amendments Act of 1958, 72 Stat. 1610, Congress eliminated entirely the right to amortize to call date, permitting amortization to be taken only over the period to maturity." (369 U.S. at 685, 82 S.Ct. at 1088.)

By purchasing bonds with an early call date at a premium which could be written off in the year of purchase, taxpayers used the amortization of premium provisions of the law to obtain tax deduction windfalls. Had Congress been concerned only with a taxpayer's risk of loss, it could easily have allowed the deduction for amortization of bond premium in the year when the bonds were actually called and the amount of loss established. But, as reflected in the Supreme Court decisions discussed above and as we repeat, the basic intent of Congress was to equalize taxes between owners of taxable bonds and owners of tax-exempt bonds. Congress could have eliminated the resulting windfalls long before it saw fit to do so.

There have been several fairly recent decisions [7] where claimed deductions based upon amortization of bond premiums were considered although no "put" options were involved. The arguments were there advanced by the Government that the purchases and transitory ownership of the securities were merely steps in what proved to be planned tax avoidance transactions, lacking any genuine investment or other commercial purpose. These arguments were rejected and it was held that the transactions qualified in all respects for deduction of the total premium amortization under the pertinent statute. These decisions from the First, Third, Sixth and Seventh Circuits merit our respectful consideration. Absent the written guarantee or "put" option the holdings were, in effect, that the transactions were not shams.

Illustrative of the nature of the transactions involved in the cases cited in footnote 7 is the case of Fabreeka Products Company v. C. I. R., 294 F.2d 876 (1961), where the First Circuit reviewed three cases decided by the Tax Court (Fabreeka Products Company v. Commissioner of Internal Revenue, 34 T.C. 290, Sherman v. Commissioner of Internal Revenue, 34 T.C. 303 and Friedman v. Commissioner of Internal Revenue, 34 T.C. 456). In each case the taxpayers had purchased bonds, callable on thirty days' notice, at a premium above call price. In one of the cases, after holding the uncalled bonds for thirty days, the taxpayer, a corporation, wrote off the premium as a deduction, distributed the bonds as a dividend to its stockholders subject to the lien of a loan. The stockholders sold the bonds at essentially the same premium, paid off the loan and retained the premium. Thus, the corporation distributed a dividend and took an equivalent deduction, in effect indirectly doing what it could not do directly. In the second Tax Court case considered in Fabreeka, an individual taxpayer purchased bonds at a premium, wrote off the premium in thirty days and sold them after six months, reporting the recovered premium as a long term gain. In the third case the taxpayer, as in the case at bar, instead of selling bonds which had been purchased at a premium, gave them to a charity subject to the lien of a purchase loan. The charity's subsequent sale netted the premium for itself and the taxpayer claimed two deductions, one for the

7. Humphreys v. Commissioner, 301 F.2d 33 (6 Cir. 1962); Gallun v. Commissioner, 297 F.2d 455 (7 Cir. 1961); Evans v. Dudley, 188 F.Supp. 9 (W.D.Pa. 1960), aff'd, 295 F.2d 713 (3 Cir. 1961), cert. denied, 370 U.S. 909, 82 S.Ct. 1254, 8 L.Ed.2d 403 (1962); Fabreeka Products Co. v. Commissioner, reversing three Tax Court decisions, 294 F.2d 876 (1 Cir. 1961); Maysteel Products, Inc. v. Commissioner, 287 F.2d 429 (7 Cir. 1961), reversing 33 T.C. 1021 (1960).

amortized premium and another for the charitable gift. There it appeared from the opinion of the Tax Court that the parties mutually understood that the broker or seller would repurchase the bonds from the buyer at an advantageous but unstipulated price after the call period had elapsed; that such favorable repurchases had been made on other occasions. In each case the Tax Court had held against the taxpayer on the ground that the anticipated tax saving was the sole motive for the entire transaction. Upon review the Government, while admitting that all taxpayers had brought themselves within the literal language of the statute, contended that there was no reality to the transactions as investments, there were no investment motives and that these were sophisticated and elaborate tax avoidance schemes where taxpayers were willing to pay out money or take some measure of risk to establish a claim to tax benefits in a much larger amount. It was held that these transactions were not shams, they were not unmarked by events or risks beyond the control of the taxpayer and they were not different in substance and effect from what they appeared, at face, to be. At 294 F.2d 879 the court said:

> " * * * Granting the government's proposition that these taxpayers have found a hole in the dike, we believe it one that calls for the application of the Congressional thumb, not the court's."

In Maysteel Products, Inc. v. C. I. R., 287 F.2d 429 (1961), a corporate taxpayer purchased bonds, borrowed the major portion of the purchase price and shortly thereafter transferred its equity in the bonds to a tax-exempt corporation. The Tax Court approved a deduction claimed for a charitable contribution but disapproved a deduction for amortizable bond premium. The Court of Appeals reversed and approved both deductions in view of the commercal reality and genuineness of the transaction, notwithstanding that taxpayer had the double purpose of making a charitable donation and obtaining the amortization deduction. At page 431 the court said:

> " * * * While the end result here was a gift—not a business transaction—the bond purchase, loan, note and pledge of collateral, sale of the bonds, and satisfaction of the loan were in every respect genuine financial and commercial transactions. They were real in every sense. And the taxpayer was exposed to all of the usual risks involved in such transactions. It incurred genuine obligations; risks and obligations beyond its control. The transaction here had economic substance, was not a sham nor rigged device without real substance or risk, and inducement or motive is without significance. Taxpayer incurred the risk of loss in event of decline in the market; was entitled to benefit from any advance; it was not bound to make the gift it ultimately did but could have retained the benefits of the transaction. Substantive and economic reality were present."

In short, the court concluded from all the facts, including the "risk of loss," that the transaction was real, both in substance and form and the motivation involved did not destroy the commercial reality and genuineness of the transaction.

The Government contends that the seller's repurchase agreement distinguishes this case from the line of cases cited in footnote 7 and that this additional factor compels the conclusion that the transaction was a sham. We have already noted that the Tax Court found for the taxpayer in Industrial Research, supra, where the bond purchaser obtained a "put" option just as in the case at bar. It is clear from the noted decisions from other circuits that "risk of loss" was a factor considered by the court but it is apparent from the decisions that such risk was not the *only* consideration which led to the conclusions that the transactions were not shams.

In the instant case the bond purchase, admittedly not made with an investment

motive but assertedly with the intent of making a charitable contribution, was a legitimate purchase of corporate bonds. The loan made by the Guaranty Trust Company to Halle for the repayment of which he was personally obligated was real in every sense. In addition to the pledge of the bonds themselves and the investment of $10,000 of his own funds, Halle was required to further secure the loan by a cash deposit. The transfer of the bonds which had been held beyond their earliest call date, their subsequent sale by the Foundation and the payment of the loan were perfectly legitimate transactions. As in other cases where deduction for amortization of bond premium was in issue, there was the possibility, even though remote, that the market price would advance during the holding period. In such event Halle stood to realize a gain since he was not obligated to give the bonds to the Foundation nor did the "put" require him to sell to Livingstone at 108; in fact, it would have been even more advantageous to Halle, in the event of an advance in market price, to give the bonds to the Foundation because the deduction allowable for charitable contributions would have been increased.

Furthermore, assuming, *arguendo*, that absence of risk of loss is a factor sufficient, in itself, to convert an otherwise legitimate transaction into a "sham," we are of the opinion that the facts and circumstances here would not support a conclusion that the risk of loss had been eliminated. Beyond dispute, and as the Government admits, if the bonds were called by the issuer at the specified call price of 100½ and assuming that Livingstone met the terms of the "put," Halle would lose $2,000. However, in the event the bond market crashed or suffered a substantial decline, Halle might sustain a much greater loss, depending upon Livingstone's financial ability to fulfill his contract of repurchase.[8] While we must not be understood as intending to cast even the slightest doubt upon Livingstone's financial responsibility or integrity, suffice it to say that there is no disclosure in this record of the number or amount of similar commitments which he may have had outstanding or his ability to perform if suddenly called upon to do so by an undetermined number of persons holding repurchase agreements. Halle clearly had the primary risk between 110 and 108 and a secondary risk between 108 and 100½ in event of a call. The risk of loss may have been reduced but clearly it was not eliminated by the "put."

The District Court concluded that it should apply "the reasoning in the Maysteel, Fabreeka and Humphreys opinions, and the principles announced and followed in Gregory, Knetsch and Bridges." But Maysteel, Fabreeka and Humphreys held *for the taxpayer* on fact situations similar or identical to this case, excepting only the existence of the "put."

It is true that in Gregory,[9] Knetsch [10] and Bridges [11] it was held that sham

---

8. The Government appears to scoff at taxpayer's suggestion of the possibility that Livingstone might not be able to meet his outstanding commitments. Livingstone was operating as a sole proprietor. His financial responsibility was patently not that of the United States nor shown to be that of a substantial financial institution with established reserves adequate to meet all contingencies. Indeed, indicative of the Government's attitude toward Livingstone, in a footnote to its brief, the following appears: "In Bornstein v. Commissioner (C.A. 1st) [334 F.2d 779] decided June 23, 1964 * * *, the Court remarked that 'This is another of the Eli Livingstone tax deduction enterprises that

have been translated by the courts into deduct now and pay later.' Also, in Jockmus v. United States, the Second Circuit, noting that Eli Livingstone had planned and promoted the transactions, stated * * * 'whose similar schemes for tax avoidance have had an extensive history of failure in the courts.' (C.A., 2d) [335 F.2d 23], * * *, decided July 8, 1964."

9. Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935).

10. Knetsch v. United States, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed. 128 (1960).

11. Bridges v. Commissioner, 325 F.2d 180 (4 Cir. 1963).

transactions had been created but on facts and involving statutes totally different from and unrelated to those in the instant case. In Gregory, taxpayer caused a "dummy" corporation to be organized for the obvious purpose of effecting, through it, a transfer to herself of certain stock in another corporation, Monitor, owned by a third corporation in which she was the sole stockholder. The newly organized corporation, to which the Monitor stock had been transferred, was dissolved in six or seven days and was liquidated by distributing all its assets, namely, the Monitor stock, to taxpayer. It was held that the attempted corporate "reorganization" under § 112(g) of the Revenue Act of 1928 was without substance and must be disregarded in determining taxpayer's liability for income tax. Although recognizing the established rule that *a taxpayer has the right, by means which the law permits, to decrease or altogether avoid what otherwise would be the amount of his taxes,* the Court held that the new corporation was organized to perform the one function of transferring a parcel of corporate shares to the individual taxpayer and not for the purpose of reorganizing a business or any part of a business. " * * * The rule which excludes from consideration the motive of tax avoidance is not pertinent to the situation, because the transaction upon its face lies outside the plain intent of the statute." (293 U.S. 465 at 470, 55 S.Ct. 266 at 268.)

In Knetsch v. United States, 364 U.S. 361, 81 S.Ct. 132 (1960), a 60-year old taxpayer purchased, in 1953, single-premium, 30-year maturity deferred annuity savings bonds with an aggregate face value of $4,000,000 from a life insurance company, paying only a nominal sum in cash, giving *nonrecourse* notes for the balance secured by the bonds and paying a substantial amount as "interest" in advance on that "indebtedness." A few days later, he borrowed from the company nearly all of the excess of the cash surrender value which the bonds would have at the end of the first contract year over the amount of the existing "indebtedness" and again paid in advance the "interest" on such additional "indebtedness." These borrowings and "interest" payments were repeated in 1954 and 1955, the bonds were surrendered in 1956 and the indebtedness was cancelled. It was held that the amounts paid as "interest" in 1953 and 1954 (the years in question) were not deductible from taxpayer's gross income under the then pertinent statutes which allowed as a deduction "All interest paid or accrued within the taxable year on indebtedness * * *." The Court took the view that each year Knetsch's annual borrowings kept the net cash value, on which any annuity or insurance payments would depend, at a mere pittance; that the money ostensibly "lent" back to him was in reality only a rebate of a substantial part of the so-called "interest" payments; that no true "indebtedness" within the meaning of the interest deduction statute was created and the transaction was a sham. At the same time, the Court reaffirmed its holding in Gregory that the legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted.

In Bridges v. C. I. R., 325 F.2d 180 (4 Cir. 1963), this court had occasion to consider and apply both Gregory and Knetsch. Two separate transactions were involved in Bridges and the facts, fully set forth in the opinion, need not be repeated in detail here. In each instance, taxpayer had purchased U. S. Government obligations at less than par, pledged them as collateral security for the repayment of a loan evidenced by taxpayer's note in the amount of the par value of the collateral and paid interest in advance without rebate of any unearned portion thereof. In each instance the maturity

date of the collateral was the same as the maturity date of the note; at maturity [12] the lender bank "purchased" the collateral at par and returned to taxpayer his cancelled note and a release. The question was whether, under the interest deduction statute, the payments by taxpayer to the "lenders" were, in fact, "interest," i. e., compensation for the use or forbearance of money, paid with respect to a genuine *indebtedness*. We there held that, from the nature and terms of the transactions, the lending banks were in complete control, Bridges was dealing only in fixed *maturity* values of Government obligations and did not stand to gain or lose on a rise or fall in the market price or value of the securities; in each instance he did, by agreement, pay out substantially more than he could hope to recover from an increase in the value of the securities; that Bridges did not, at any time, have the uncontrolled use of additional money, of the securities themselves or the interest payable thereon; that taxpayer did not receive money or equivalent economic benefits in the amount of the bank "loans." Relying primarily upon Knetsch where the interest deduction statute was considered, this court affirmed a Tax Court holding against Bridges that no real indebtedness was created and, as payments of interest on "indebtedness," the transactions were shams and could not in any wise affect Bridges' interest therein except to establish a deliberately "built-in loss" to reduce his profit otherwise resulting from the disposition of the pledged securities at a price greater than the cost of purchase.

We think the instant case is distinguishable from Gregory, Knetsch and Bridges and indistinguishable from Industrial Research, decided by the Tax Court.

Counsel for the Government conceded during argument that taxpayer should be allowed a $2,000 deduction under the bond premium amortization statute although persisting in his characterization of the transaction as a sham, without economic reality. This concession was made only because of the admitted risk of loss of that portion of the purchase price unprotected by the "put." But we conclude that it would be unwise to attempt to formulate a rule apportioning to a taxpayer the benefit clearly provided by Congress under the then pertinent deduction statute by holding a transaction to be valid in part and "sham" in part. The innumerable imponderables should discourage the adoption of such a rule.

In the face of respectable authority, it appears under close scrutiny and upon careful analysis that the Government would have us hold, in effect, that because Congress saw fit to grant a deduction for a charitable donation and the taxpayer utilized it, this destroys the economic reality of a transaction which complies with the statute allowing another distinct deduction. This we decline to do. We note, however, with more than passing interest, that the "hole in the dike" has been plugged by the "Congressional thumb." The case will be remanded so that the appropriate judgment may be entered in favor of the taxpayer.

Reversed and remanded.

12. In one transaction where the maturing period of the bonds and note was five years, either party had the right to accelerate the maturity of the note after approximately six months and the bank agreed to purchase the pledged bonds at par and apply the proceeds to discharge Bridges' "indebtedness" in event of such acceleration.