**COMMISSIONER OF INTERNAL REVENUE v. KORELL.**

No. 202, Docket 21225.

United States Court of Appeals
Second Circuit.

Argued May 11, 1949.

Decided June 8, 1949.

Rehearing Denied July 14, 1949.

153

Fred E. Youngman Sp. Asst. to the Atty. Gen., of Washington, D. C. (Theron Lamar Caudle, Asst. Atty. Gen., and Ellis N. Slack, Robert N. Anderson, and Sumner M. Redstone, Sp. Assts. to the Atty. Gen., all of Washington, D. C., on the brief), for petitioner.

Paul L. Peyton, of New York City (John J. Fogarty and Frederick H. Bruenner, both of New York City, on the brief), for respondent.

Before CHASE, CLARK, and DOBIE, Circuit Judges.

CLARK, Circuit Judge.

This case presents a problem as to the nature of the "amortizable bond premium" which was first allowed as a deduction from gross income for federal income tax purposes in 1942. The taxpayer has claimed such a deduction on his 1944 tax for the excess cost to him, over the amounts payable, of certain bonds which were callable at the debtor's option and convertible at his option into shares of the debtor's stock. His contention has been sustained by the Tax Court as against the Commissioner's contention that the statutory deduction is allowable only for a "true bond premium" and that the excess of cost in the case of convertible bonds of the kind here in issue is not of that nature.

Judge Opper for the Tax Court has written a carefully reasoned opinion, 10 T.C. 1001, which was reviewed by the whole court and which we think fully meets the issues presented by the Commissioner. In it he states the facts, which were stipulated, the rather lengthy statutory provision and treasury regulations, and certain of the committee reports explaining the statutory provision when it was adopted. Since the material is thus available, we shall merely refer to it where apposite without full quotation.

In August, 1944, respondent purchased $50,000 principal amount of American Telephone and Telegraph Company 15-year 3 per cent convertible debenture bonds, due September 1, 1956, at prices ranging from $121 to $121-1/4 per $100 principal and a total cost of $60,638.75. At that time the bonds were subject to call by the company on thirty days' notice at 104%; and, indeed, they were so called and paid on September 1, 1947. In his 1944 return, respondent claimed as a deduction the amount of $8,638.75, representing the difference between the cost, stated above, and the call price of $52,000. It is this deduction which the Commissioner disallowed in making his deficiency assessment and which is restored by the decision of the Tax Court, now before us on the Commissioner's petition for review.

To round out the picture, certain additional facts must be adverted to; indeed, these become crucial to the discussion. Under the terms of the bond respondent had the option, during all times here important, of converting the bonds into stock of the company by surrendering $100 principal of the bond issue and $40 in cash in exchange for each share of stock received. On the dates when he purchased the bonds the average selling price of the stock was $163.1875 and $163.6875 per share. The Commissioner, in arguing that the excess paid for the bonds here over their face value represented the value of the conversion rights, stresses the correspondence in value between the price of each bond plus $40 and the current quotation for the stock into which it could be converted. He adds that "it would be naive to assume that the bonds here involved were purchased at such exorbitant prices purely for investment purposes." We shall avoid the charge of naiveté by expressing no dissent; whatever respondent may actually have done with these bonds after 1944, certainly it would be perfectly normal to expect a holder to sell them in due course after the proper interval to take advantage of the lower rates for capital gains.[1] And the obvious advantage, taxwise, of trans-

---

[1] Such course, we are told, was actually followed by another taxpayer as to this same bond issue in a case where likewise the Tax Court reversed the Commissioner, Shoong v. Commissioner, 1948 Prentice-Hall T. C. Memorandum Decisions, ¶48,095, now pending on appeal to the Court of Appeals for the Ninth Circuit.

actions of this form might make such convertible bonds all the rage of security markets. Nevertheless the difficulties of a judicial attempt to remodel legislation to deal with such a situation at once fairly and not overdestructively remain obvious.

Let us then turn to the statute which still remains the best indicator of the legislative intent. Ex parte Collett, 337 U.S. 55, 69 S.Ct. 944; Gemsco, Inc., v. Walling, 324 U.S. 244, 260, 65 S.Ct. 605, 89 L.Ed. 921. After having provided for the deduction of "amortizable bond premium," I.R.C. § 23(v), 26 U.S.C.A. § 23(v), it goes on to define the latter. I.R.C. § 125, as added by § 126 of the Revenue Act of 1942, c. 619, 56 Stat. 798, 26 U.S.C.A. § 125. In summary it provides that the "amount of bond premium" shall be determined with reference to the (in this case) cost and the "amount payable on maturity or on earlier call date," and "the amortizable bond premium" of the taxable year shall be "the amount of the bond premium attributable to such year." I.R.C. § 125(b)(1) and (2), 26 U.S.C.A. § 125(b)(1, 2). As Judge Opper has stated the objective, "the premium paid must be recovered tax-free out of the earnings of the bond very much as depreciation must be recovered out of the income of depreciable property if the true distinction between income and recovery of capital is to be preserved." [2] Finally subd. (d), "Definition of bond," provides: "As used in this section, the term 'bond' means any bond, debenture, note, or certificate or other evidence of indebtedness, issued by any corporation and bearing interest," and then goes on to exclude bonds constituting stock in trade of the taxpayer or held primarily for sale to customers in the ordinary course of business.

Thus it will be seen that there is here provided a complete statutory scheme applying in general terms to all forms of bonds, including—as is shown by the reference to the "call date"—callable bonds. Hence there is no sound basis for excluding from the operation of the statute convertible bonds, even though the premium paid on them might well be due more to the privilege of conversion than to other features, such as the callability of the bonds at a premium. And this, it is made clear by the Committee Reports, was the view of the legislators, for they so state in language relied upon by the Tax Court, so directly to the point that we shall quote it, viz: "The fact that a bond is callable or convertible into stock does not of itself prevent the application of this section. In the case of a callable bond, the earliest call date will, for the purposes of this section, be considered as the maturity date. Hence, the total premium is required to be spread over the period from the date as of which the basis of the bond is established down to the earliest call date, rather than down to the maturity date. In the case of a convertible bond, if the option to convert the bond into stock rests with the owner of the bond, the bond is within the purview of this section." H. Rep. No. 2333, 77th Cong., 2d Sess., 80 (1942—2 Cum.Bull. 372, 433, 434); Sen. Rep. No. 1631, 77th Cong., 2d Sess., 94 (1942—2 Cum.Bull. 504, 576).

The intent therefore to include convertible bonds generally within the operation of the statute cannot be questioned, and the Commissioner is really forced to the rather extreme position of saying that only the particular type of convertible bond here in issue does not have the "true bond premium," which alone, according to his view, is to be amortized. For this he cites as significant the precise wording of an applicable Treasury Regulation. In fact, the section, after permitting "the method of amortizing bond premium regularly employed by the holder of the bond" to be used "if such method is reasonable," then provides that the method in all other

---

[2] "Under existing law, bond premium is treated as capital loss sustained by the owner of the bond at the time of disposition or maturity and periodical payments on the bond at the nominal or coupon rate are treated in full as interest. The want of statutory recognition of the sound accounting practice of amortizing premium leads to incorrect tax results which in many instances are so serious that provision should be made for their avoidance." H.R.Rep.No.2333, 77th Cong., 2d Sess., 47, 1942, quoted by the Tax Court below.

cases shall be "in accordance with regulations prescribing reasonable methods of amortizing bond premium, prescribed by the Commissioner with the approval of the Secretary." I.R.C. § 125(b)(3) (A) and (B), 26 U.S.C.A. § 125(b)(3)(A, B). This appears to concern more the method of computing the yearly deductions than the allowance of the deductions themselves. At any rate, § 29.125 of Treas. Reg. 111 contains extensive and detailed provisions which, inter alia, accept complete application of the section to both callable and convertible bonds. The provision most in point here, subsec. 5 of § 29.125 of Treas.Reg. 111, first states: "The fact that a bond is callable or convertible into stock does not, in itself, prevent the application of section 125." It then goes on to provide that in the case of a callable bond the earlier call date is considered the maturity date for application of the statute and for the spreading of the bond period over the period involved.[3] It concludes, "A convertible bond is within the scope of section 125 if the option to convert on a date certain specified in the bond rests with the holder thereof." This, last sentence (and particularly the words "on a date certain") is the one about which discussion has hinged.

In its decision the Tax Court concluded that the words involved appear to be "a gratuitous addition by respondent not founded upon the statutory language and directly in conflict with its legislative history." Accordingly it found itself unable to ascribe to the provision the validity which would result in supporting petitioner's position herein. Petitioner now assails this holding as in itself gratuitous in that the language "does not necessarily exclude bonds convertible at any time by the holder," and the exclusion should be considered accomplished by definition of "true bond premium" within the meaning of the statute itself. We can well agree with the argument that these words do

not necessarily reach our case, which may be one not specifically covered by the regulations beyond the generality of statement elsewhere contained in them. But that gets us little further along, for we must still give effect to the statute which contains no suggestion of the narrowing concept now urged to be a part of it. Nor does petitioner suggest any definition of his concept of sufficient precision so that it could safely be relied on by taxpayers or revenue enforcing authorities hereafter. In short, the narrow rule of exclusion does not appear to us as justifiable either on grounds of equity or as a reasonable interpretation of the statutory language. The particular option which is relied on to remove the transaction from the statutory grant is at most only a bit more extensive —or more valuable—than one admittedly within it. The difference is thus one merely of degree and not of kind. Indeed, the difficulty with petitioner's position is that it requires the making of narrow and quite possibly unfair distinctions between varying bond issues without warrant in the general language employed or in the legislative history. Why should a bond callable at 107 (as these originally were) have this tax option denied to a holder thereof only when it is accompanied by the grant of a privilege to convert into stock, or more particularly only when it is accompanied by the grant of such a privilege of conversion when it is exercisable at any time, instead of at a future specified time or interval of time? To attempt to make such distinctions in a statute so broadly and generally worded seems to us to be trespassing beyond the judicial, and upon the legislative, process.

Affirmed.

### On Petition for Rehearing.
PER CURIAM.

While we do not consider that we have misunderstood the Commissioner's position, at least to the extent asserted in his earnest

---

[3] Hence the taxpayer here properly treated as the earliest call date for his bonds the date which was thirty-one days subsequent to his purchase and therefore he deducted the entire premium as a loss during the year 1944—a method of computation which is not challenged by the petitioner.

and vigorous petition for a rehearing, yet it is desirable, against the event that the case may go higher, that his contentions before us be not misstated. Accordingly we set forth his position in his own words, viz., "that, as a matter of common understanding, and furthermore, as demonstrated by the legislative history, 'amortizable bond premium' represents the amount which has been originally paid to obtain a higher rate of interest and which is reflected in each interest payment as the difference between the average or true yield of the bond and the actual interest rate." This view that the quoted words have a single meaning so well understood that the statutory explanation can be considered only a method of computation and not a definition must necessarily control and limit the word "premium" itself. So the Commissioner says: "Bond premium is not any payment over the call price made in connection with the purchase of a bond regardless of the nature or purpose of the payment. It is not a payment manifestly made for an option to purchase stock as that here involved. Even were the legislative history unconvincing it could be demonstrated that as a matter of common understanding a bond premium represents the excess capital paid to obtain a higher rate of interest."

But this scholarly accountant's concept, which is not so naturally a legal or a lay mandate, has not appealed to us, as it did not to the several members of the Tax Court, 10 T.C. 1001, as being of universal significance. Nor did the legislative history —which was, in fact, cited in the Tax Court's decision and referred to by us— show so precise and exclusive a meaning ascribed to a fairly ordinary word. As a matter of fact, this restricted meaning of "premium" is definitely rejected in the law of trusts, and in the apportionment of principal and income to life tenant and remainderman, where the general idea of amortization has had perhaps its most extensive development in the law. Thus where amortization is required, a trustee is expected to restore to principal the excess amount he has expended, not some lesser theoretic amount resting on an unknown variable such as the assumed normal rate of interest on money. 1 Restatement, Trusts, § 239, comment f, 1935; 2 Scott on Trusts, § 239.2, 1939; 4 Bogert on Trusts and Trustees, § 831, 1935. Indeed, from the time of Holmes on, the idea that the premium is paid solely for interest above the market rate has been attacked as clearly a fiction. Hemenway v. Hemenway, 134 Mass. 446, 449; New England Trust Co. v. Eaton, 140 Mass. 532, 544, 545, 4 N.E. 69, 77, 78, 34 Am.Rep. 493; 45 Yale L.J. 156; 20 Minn.L.Rev. 203; 34 Mich.L.Rev. 448.[1] The passages quoted by the Commissioner seem to us no more than apt illustration and not at all a suggestion of exclusion of all else from the concept "premium," or of limitation of the broad statutory language. And the demonstration seems complete with the flat statement in the committee reports relied on by both the Tax Court and us—without the qualifying provisions surely natural if the Commissioner's projected limitations had been in the minds of the legislators—that "in the case of a convertible bond, if the option to convert the bond into stock rests with the owner of the bond, the bond is within the purview of this section."

The petition for rehearing is denied.

---

[1] "That the premium is paid solely in respect of interest, which is the assumption supporting amortization, is a fiction, is demonstrated by any survey of bond prices." 45 Yale L.J. 156, 158, discussing Old Colony Trust Co. v. Comstock, 290 Mass. 377, 195 N.E. 389, 101 A.L.R. 1. The author of the annotation to this case, 101 A.L.R. 7, 9, has tried valiantly here and elsewhere, see 48 A.L.R. 689, 131 A.L.R. 1426, to argue that the problem in property law is only a simple mathematical and financial one, but without success with the courts. The uncertainties involved afforded one of the reasons for the rejection of a duty to amortize in the Uniform Principal and Income Act, § 6, 9 U. L. A. 593, 594, 599; cf. 1929 Handbk. Nat. Conf. of Commissioners on Uniform State Laws 290-292.