COMMISSIONER OF INTERNAL REVENUE *v.*
KORELL.

No. 384.   Argued February 7, 1950.—Decided June 5, 1950.

*Arnold Raum* argued the cause for petitioner.  With
him on the brief were *Solicitor General Perlman, Assistant
Attorney General Caudle, Ellis N. Slack* and *Oscar H.
Davis.*

*Paul L. Peyton* argued the cause and filed a brief for respondent.

*Nat Schmulowitz* and *Peter S. Sommer* filed a brief for Shoong et al., as *amici curiae,* supporting respondent.

MR. CHIEF JUSTICE VINSON delivered the opinion of the Court.

The tax consequences of a purchase of convertible bonds are in issue here. In August, 1944, respondent, an individual taxpayer, purchased certain American Telephone and Telegraph Company bonds, each having a face value of $100, at a premium price averaging slightly in excess of $121. Each bond was convertible into a share of common stock, at the option of the bondholder, upon the payment of $40. The market price of the stock was over $163 when respondent made his bond purchases. The bonds were callable prior to maturity date according to a schedule appearing in the indenture; had the corporation given appropriate notice at the dates of respondent's purchases, the bonds would have been redeemed at $104.

In his 1944 income tax return, respondent claimed a deduction in excess of $8,600 for amortizable bond premium. He computed his deduction on each bond as the difference between his purchase price, $121, and the call price, $104. This computation is concededly correct if the deduction is allowable. The Commissioner of Internal Revenue, petitioner here, refused to allow any such deduction. His theory was that § 125 of the Internal Revenue Code establishing the deduction for "amortizable bond premium" did not include premium paid for the conversion privilege. A contrary view of the statute was adopted by the Tax Court. 10 T. C. 1001 (1948). The court below affirmed, holding that respondent was entitled to the amortization deduction. 176 F. 2d 152 (1949). We granted certiorari, 338 U. S. 890 (1949), to resolve

the conflict between the decision below and that of the Court of Appeals for the Ninth Circuit in *Commissioner v. Shoong,* 177 F. 2d 131 (1949).

Prior to 1942, bond premium was irrelevant for tax purposes. Whether or not the purchase price exceeded the face value of the bond, the holder considered the full price as the basis for capital gain or loss, and reported all taxable interest received as income.[1] In presenting its 1942 tax proposals, however, the Treasury adopted the view that each receipt of interest is not entirely income but is partially a restoration of capital. Its spokesman pointed to the consequent discrimination against holders of taxable bonds: they were being taxed on a return of capital, while holders of tax-exempt bonds were not.[2] To remedy this inequity, the Treasury recommended that amortization of premium be permitted in the case of taxable bonds, and that the basis for capital gain or loss for all bonds be adjusted by the amount of deduction allowable for taxables and disallowable for tax-exempts. These recommendations were ultimately included in the Revenue Act of 1942, 56 Stat. 798, 822, as §§ 113 and 125 of the Internal Revenue Code.

Section 125 contains four subsections.[3] In (a), the general rule is established, applicable "In the case of any

---

[1] *New York Life Ins. Co.* v. *Edwards,* 271 U. S. 109, 116 (1926); cf. *Old Colony R. Co.* v. *Commissioner,* 284 U. S. 552, 561 (1932).

[2] Statement of Randolph Paul, then Tax Adviser to the Secretary of the Treasury and subsequently General Counsel of the Department, 1 Hearings before House Committee on Ways and Means on Revenue Revisions of 1942, 77th Cong., 2d Sess. 90 (1942).

[3] Int. Rev. Code § 125, titled "Amortizable Bond Premium," reads as follows:

"(a) *General rule.* In the case of any bond, as defined in subsection (d), the following rules shall apply to the amortizable bond premium (determined under subsection (b)) on the bond for any taxable year beginning after December 31, 1941:

"(1) *Interest wholly or partially taxable.* In the case of a bond (other than a bond the interest on which is excludible from gross

bond . . .," that the deduction for amortizable bond premium may not be taken if the interest is tax-exempt, but may be if the bond interest is taxable. Taxpayers holding bonds in the latter category may elect whether

income), the amount of the amortizable bond premium for the taxable year shall be allowed as a deduction.

"(2) *Interest wholly tax-exempt.* In the case of any bond the interest on which is excludible from gross income, no deduction shall be allowed for the amortizable bond premium for the taxable year.

"(3) *Adjustment of credit in case of interest partially tax-exempt.* In the case of any bond the interest on which is allowable as a credit against net income, the credit provided in section 25 (a) (1) or (2), or section 26 (a), as the case may be, shall be reduced by the amount of the amortizable bond premium for the taxable year.

"(For adjustment to basis on account of amortizable bond premium, see section 113 (b) (1) (H)). [See note 6, *post,* p. 625.]

"(b) *Amortizable bond premium—*

"(1) *Amount of bond premium.* For the purposes of paragraph (2), the amount of bond premium, in the case of the holder of any bond, shall be determined with reference to the amount of the basis (for determining loss on sale or exchange) of such bond, and with reference to the amount payable on maturity or on earlier call date, with adjustments proper to reflect unamortized bond premium with respect to the bond, for the period prior to the date as of which subsection (a) becomes applicable with respect to the taxpayer with respect to such bond.

"(2) *Amount amortizable.* The amortizable bond premium of the taxable year shall be the amount of the bond premium attributable to such year.

"(3) *Method of determination.* The determinations required under paragraphs (1) and (2) shall be made—

"(A) in accordance with the method of amortizing bond premium regularly employed by the holder of the bond, if such method is reasonable;

"(B) in all other cases, in accordance with regulations prescribing reasonable methods of amortizing bond premium, prescribed by the Commissioner with the approval of the Secretary.

"(c) *Election on taxable and partially taxable bonds—*

"(1) *Eligibility to elect and bonds with respect to which election permitted.* This section shall apply with respect to the following

or not to amortize in accordance with rules laid down in subsection (c). Subsection (b) defines the method of computing "the amount of bond premium, in the case of the holder of any bond . . . ." Petitioner urges that this does not define the kind of bond premium which is amortizable; respondent contends that this provision establishes a mandatory computation applicable to any bond premium. Subsection (d) consists of a general definition of "bond" and certain exceptions thereto, chiefly bonds held for sale or as stock in trade. That the securities purchased by respondent fall within the general definition and without the exceptions is undisputed.

There can be no doubt that the callability and convertibility of these bonds do not remove them from the reach of § 125. The role of such bonds was specifically brought into the congressional discussion by at least one witness at the hearings.[4] And the Congress rendered unmistakably clear answers in the language of the Act, e. g., by express reference to "earlier call date," § 125 (b) (1), and in both Committee Reports. "The fact that a bond is callable or convertible into stock does not of itself

---

classes of taxpayers with respect to the following classes of bonds only if the taxpayer has elected to have this section apply.

.          .          .          .          .

"(d) *Definition of bond.* As used in this section, the term 'bond' means any bond, debenture, note, or certificate or other evidence of indebtedness, issued by any corporation and bearing interest (including any like obligation issued by a government or political subdivision thereof), with interest coupons or in registered form, but does not include any such obligation which constitutes stock in trade of the taxpayer or any such obligation of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or any such obligation held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."

[4] See statement of Roy C. Osgood, 2 Hearings before Senate Committee on Finance on H. R. 7378, 77th Cong., 2d Sess. 1728–29 (1942).

prevent the application of this section. In the case of a callable bond, the earliest call date will, for the purposes of this section, be considered as the maturity date. Hence, the total premium is required to be spread over the period from the date as of which the basis of the bond is established down to the earliest call date, rather than down to the maturity date. In the case of a convertible bond, if the option to convert the bond into stock rests with the owner of the bond [as it did in this case], the bond is within the purview of this section." [5] The express decision of Congress to include the type of bonds purchased by respondent is of course binding on the courts.

Petitioner concedes that the bonds purchased by respondent are within the reach of § 125, but he urges that this case does not involve the kind of premium which Congress had in mind. The argument is that this premium was paid for the conversion privilege, whereas Congress intended to include only that premium (entitled "true" premium by petitioner) which is paid for securing a higher rate of interest than the market average and for nothing else. We reject this argument as inapposite to the structure of the statute, unsupported by the legislative history and inconsistent with the normal use of the term "bond premium."

As Congress wrote the statute, the scope of "bond premium" is adequately denoted by defining "bond." There was no need for Congress to qualify both words in order to make its meaning clear; "premium" as an isolated term may not be defined in the statute nor explained in the legislative history, but "premium" is never used in the statute apart from its mate "bond." No attempt to define and distinguish the reasons for paying premium

---

[5] H. R. Rep. No. 2333, 77th Cong., 2d Sess. 80 (1942). Precisely the same language appears in S. Rep. No. 1631, 77th Cong., 2d Sess. 94 (1942). U. S. Treas. Reg. 111, § 29.125-5, is of identical tenor.

mark the pertinent Treasury Regulations 111, § 29.125. They mirror the structure of the statute and are constructed in terms of "bonds." Again, we note that the bonds here involved are without question embraced by the statute.

To be sure, Congress might have proceeded by defining "premium" (and "true" premium) rather than, or as well as "bond." But we cannot reject the clear and precise avenue of expression actually adopted by the Congress because in a particular case we may know, if the bonds are disposed of prior to our decision, that the public revenues would be maximized by adopting another statutory path. Congress was legislating for the generality of cases. It not only created a new deduction but also required that the basis be adjusted to the extent of the deduction allowable for taxables and disallowable for tax-exempts.[6] The adjustment increased the revenue potential, for the lower basis obviously raised possible capital gain and lowered allowable capital loss. In the case of tax-exempt bonds, which had a total par value in 1942 of over 58.5 billion dollars,[7] there was no allowable deduction to be set off against this new revenue potential. In the case of taxable bonds, whether the tax paid on capital gains will exceed the tax avoided by the deduction depends in each particular instance upon the uncertainties of market fluctuations and tax rates and the cluster of

---

[6] Int. Rev. Code § 113 (b) (1) provides that "Proper adjustment in respect of the property shall in all cases be made . . . (H) in the case of any bond (as defined in section 125) the interest on which is wholly exempt from the tax imposed by this chapter, to the extent of the amortizable bond premium disallowable as a deduction pursuant to section 125 (a) (2), and in the case of any other bond (as defined in such section) to the extent of the deductions allowable pursuant to section 125 (a) (1) with respect thereto." See note 3, *ante,* p. 621, for the text of § 125.

[7] Of this amount, 25.5 billion was wholly, and 33.0 billion partially tax-exempt. Statistical Abstract of the United States 372 (1948).

other factors which induces a bondholder to act and determines his tax in given years.[8]  These factors may combine in a specific case to produce an effect upon revenue which to some may appear too drastic for Congress to have intended.  But there is nothing in this record to indicate that Congress or the Treasury anticipated that the total long-run effect of §§ 113 and 125 on the yield from both taxables and tax-exempts would be to decrease federal revenue.  And even if Congress had expected that some loss of revenue would be entailed, it might have decided that more equal treatment of taxpayers was more important than possible revenue loss; it cannot be argued that Congress lacked the legislative discretion to have reached such a conclusion.  If in practice these sections are causing such loss of revenue as to indicate that Congress may have erred in its balancing of the competing considerations involved, the amendment must obviously be enacted by the Congress and not the Commissioner of Internal Revenue or this Court.

The legislative history fails to intimate that Congress intended to confine the deduction to bonds the premium on which was paid for a higher-than-market interest rate. At most, petitioner's presentation of the legislative materials suggests that Congress may have had the bondholder who was seeking a higher interest rate primarily in mind; but it does not establish that Congress in fact legislated with reference to him exclusively.[9]  Congress,

---

[8] In this case, the record does not disclose how petitioner disposed of the bonds.  If for some reason he had sold them after six months at a price above 138, his capital gain would have exceeded the deduction he took on the bond premium.  This possibility is not merely theoretical, for the bonds in fact stood above 138 for over a year, starting in August, 1945.

[9] Petitioner cites H. R. Rep. No. 2333, 77th Cong., 2d Sess. 47 (1942), and the statements of John O'Brien, 1 Hearings before Senate Committee on Finance on H. R. 7378, 77th Cong., 2d Sess. 52 (1942),

and the Treasury in advising Congress, may well have concluded that the best manner of affording him relief and correcting the inequitable treatment of bondholders whose interest receipts were taxable, was to define the scope of the amendment by reference to types of bonds rather than causes of premium payment.

As "bond premium" is used by accountants and other writers in the securities field, it is any payment in addition to face value.[10]  There is no suggestion that the words have only a limited significance, echoing petitioner's "true" premium, applicable solely to that extra price caused by the desire to obtain a higher than average interest yield.  On the contrary, some authors have noted the variety of causes which induce the payment of bond premium, and the practical impossibility of disentangling and isolating them for the purpose of relative evaluation, as would be required if petitioner's reading of the statute were upheld.[11]  We adopt the view that "bond premium" in § 125 means any extra payment, regardless of the reason therefor, in accordance with the firmly established

and Randolph Paul, 1 Hearings before House Committee on Ways and Means on Revenue Revision of 1942, 77th Cong., 2d Sess. 90 (1942).  None of these can be taken as a clear statement excluding premium reflecting financial inducements other than the interest rate.

[10] E. g., "When bonds sell at a price greater than par, they are said to sell at a premium . . . ."  Financial Handbook 1210 (3d ed. 1948); ". . . bond premium—the amount by which issue price, or cost at later date, exceeds maturity value . . . ."  Paton, Advanced Accounting 197 (1941); Grossman, Investment Principles and Practice 14 (1939); Noble, Accounting Principles 447 (4th ed. 1945).  And see *Old Colony R. Co.* v. *Commissioner*, 284 U. S. 552, 555 (1932); *New York Life Ins. Co.* v. *Edwards*, 271 U. S. 109, 116 (1926); 4 Bogert, Trusts and Trustees, § 831 (1935); 2 Scott on Trusts § 239.2 (1939).

[11] See, e. g., 1 Dewing, Financial Policy of Corporations 662 (4th ed. 1941); Saliers and Holmes, Basic Accounting Principles 509 (1937); 4 (pt. 1) Bogert, Trusts and Trustees 319 (1935); 2 Scott on Trusts 1337 (1939); Williams, Are Convertibles Now Attractive? 83 Mag. of Wall St. 134 (1948).

principle of tax law that the ordinary meaning of terms is persuasive of their statutory meaning.[12]

We conclude that Congress made no distinctions based upon the inducements for paying the premium. Congress delimited the bond premium it wished to make amortizable in terms of categories of bonds, and there is no doubt that respondent purchased bonds which are included within the purview of § 125. Respondent is therefore entitled to this deduction and the judgment below is

*Affirmed.*

MR. JUSTICE BLACK dissents. He believes that this case should be decided in accordance with, and for the reasons given by, the opinion of the Court of Appeals for the Ninth Circuit in *Commissioner* v. *Shoong,* 177 F. 2d 131 (1949).

MR. JUSTICE DOUGLAS and MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

---

[12] *Crane* v. *Commissioner,* 331 U. S. 1, 6–7 (1947); *Helvering* v. *Flaccus Oak Leather Co.,* 313 U. S. 247, 249 (1941); *Helvering* v. *San Joaquin Fruit & Investment Co.,* 297 U. S. 496, 499 (1936); *Lang* v. *Commissioner,* 289 U. S. 109, 111 (1933); cf. *Atlantic Coast Line R. Co.* v. *Phillips,* 332 U. S. 168, 171 (1947).