**SOUTHWEST GREASE AND OIL COMPANY, Inc., Plaintiff,**
v.
**UNITED STATES of America, Defendant.**
Civ. A. No. W–3999.
United States District Court
D. Kansas.
Sept. 26, 1969.

Martin, Porter, Pringle, Schell & Fair, by Robert Martin, Wichita, Kan., for plaintiff.

Robert J. Roth, U. S. Atty., District of Kansas, Wichita, Kan., Darrell Hallett, Tax Division, U. S. Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

WESLEY E. BROWN, District Judge.

This is a civil action for refund of $81,991.50 in income taxes plus interest paid for the year 1961. Plaintiff, the Southwest Grease and Oil Company, Inc., hereafter referred to as "Southwest Grease", or "taxpayer", claims that the overpayment resulted from the wrongful disallowance of certain items of expense incurred in connection with its redemption of convertible debentures.

The case is now before the Court on cross-motions for Summary Judgment [Dkt. ##13, 15]. The Court has jurisdiction under 28 U.S.C.A. §§ 1340, 1346 (a) (1). The matter has been submitted upon depositions, exhibits, and stipulations of fact entered into by the parties.

The deductions claimed by taxpayer consist of two items: one, an alleged "premium" of $116,000 paid by Southwest Grease upon retirement of a 1958 debenture issue; and second, an item of $4,122.15 of unamortized issue cost of this 1958 issue. Taxpayer claims these items are deductible as ordinary and necessary business expenses under the provisions of Section 162(a) of the 1954 Internal Revenue Code, 26 U.S.C.A. § 162(a), as implemented by Treasury Regulation 1.61–12(c) (1).

After review of the evidence submitted in support of the cross-motions, the Court finds that the following facts have been established without dispute:

1. Southwest Grease is a corporation with its principal office and place of business in Wichita, Kansas. Its primary source of income is derived from the sale of lubricating oil and grease. [Stipulation, Dkt. #12].

2. In February, 1958, taxpayer purchased the assets of the Battenfeld Grease and Oil Corporation of Kansas City, Missouri. This acquisition was financed by a loan from the American National Insurance Company, a new issue of 32,290 shares of common stock (par value of $7.50), and $400,000 of 15 year, 6%, convertible subordinated debentures. [Stipulation, Dkt. #12, Deposition, McCabe, pp. 5–8].[1] The new issue of stock was limited to a figure under $300,000

1. Although $500,000 in debentures was authorized, only $400,000 worth were actually issued. [See Dkt. #12, ¶3(g)].

because the Company wished to avoid the costs of "long form" registration with the S.E.C. [McCabe Deposition, p. 6].

3. The 6% convertible subordinate debentures mentioned above were issued as of February 15, 1958, and were sold, at par, for a total of $400,000 to the following persons and organizations. [Dkt. #12, ¶ 3(b); McCabe Deposition, p. 29]:

| Purchaser | Par Value of Debentures |
|---|---|
| Harold A. Mayor, Sr. | $75,000 |
| Harold A. Mayor, Jr. | 50,000 |
| Joe S. Johnson | 75,000 |
| Paul McIntyre | 25,000 |
| Merrill L. Carter | 25,000 |
| Charles J. Slawson | 25,000 |
| Frank E. Hedrick | 25,000 |
| F. W. Castholm | 25,000 |
| Mayco Investments, Inc. | 50,000 |
| Beech Aircraft Pension Trust | 25,000 |
| | $400,000 |

4. All of the foregoing described purchasers, with the exception of the Beech Pension Trust, were shareholders of Southwest. The debentures were not offered for sale publicly, and they could not be sold or transferred to any person other than to one or more of the ten original purchasers of the issue, except in the event that the debentures were registered with, or approved by, federal and state authorities [McCabe Deposition pp. 12, 13; Ex. 1]. Six of the eight individual purchasers were members of the Board of Directors of Southwest Grease, and the Mayco Investment Company was a corporation controlled by the Mayor family. [Mayor Deposition pp. 12–15].

5. The 1958 6% convertible debentures [Dkt. #6, Ex. 1] were 15 year obligations, due February 15, 1973. Interest of 6% was cumulative, to be paid semi-annually on February 15 and August 15, but payment of this interest was subordinate to accrued payments which might be due on the "Senior Debt" of the corporation.[2] The debentures were subordinate to such "Senior Debt" in all respects, although they were superior to stock rights, and no cash dividend on any shares of common or preferred stock could be paid during default of any payment of principal or interest due on the debentures. None of the provisions of the debentures could be modified without the consent of all holders of the "Senior Debt", 85% of the shareholders of the corporation, and all holders of the debentures.

After February 15, 1960, the debentures were subject to redemption by the corporation, upon 30 days' notice, as a whole, or in part by lot, at par and accrued interest. However, such redemption could not be made without prior written consent of all holders of the "Senior Debt".

The conversion feature of the debentures entitled a holder to convert each $1,000 principal into common stock of Southwest Grease, beginning August 15, 1959, and until August 15, 1973, in declining amounts, on the following basis: (1) Between August 15, 1959 and August 14, 1962—129 shares of common stock; (2) between August 15, 1962 and Au-

2. In effect, the "Senior Debt" consisted mainly of large loans outstanding from the American National Insurance Company, and any renewals, extensions or refunding of such debt.

gust 14, 1965—121 shares; (3) between August 15, 1965 and August 14, 1968—114 shares; (4) between August 15, 1968 and until February 15, 1973—108 shares. If called for redemption, the securities could be redeemed for stock up to the actual date of redemption.[3] The right of conversion was made subject to proper registration of available common stock with federal or state agencies, and the corporation agreed that it would endeavor to obtain proper registration and approval.[4]

6. The Court further finds that the above described 1958 convertible debentures constituted a true indebtedness of the corporation. The terms of the debentures establish that the parties intended to create a debtor-creditor relationship, the obligations had a definite maturity date, and while they were subordinated to the "senior debt", this was because of the special nature of the problems faced by Southwest Grease in raising sufficient funds to purchase the Battenfeld operation. The debentures were superior to all stock rights. The holders had no voting rights in the corporate structure, and the debentures were not redeemable at the election of the holders. The fact that the debentures were convertible into corporate stock does not destroy the true nature of the indebtedness. In raising the funds necessary for the proposed purchase, the first priority on assets was assigned to the American National Insurance Company, and the debentures provided very little in the way of security. The convertible feature of the issue provided an added incentive to prospective purchasers. [McCabe Deposition pp. 8–9].

7. The purchase of the assets of the Battenfeld company was effected, and Mr. Quentin McCabe, formerly with Battenfeld, became Secretary-Treasurer of Southwest Grease. In reviewing the corporate structure of Southwest Grease in 1960, he discovered that although there was sufficient stock authorized to cover the conversion provision of the 1958 debentures, there was no registered stock available to honor the debentures, should they be converted. It was his opinion that the expense and time element necessary for S.E.C. registration of new stock would be impractical and prohibitive, and he so advised the Board of Directors. At this time, no debenture holder had requested conversion. [McCabe Deposition, pp. 14–22].

8. The fair market value of the common stock into which the 6% subordinate convertible debentures could have been converted, as of January 4, 1961, was approximately $10.00 per share. [Dkt. #12, ¶ 3(1)].

---

3. The debentures provided:
   The holder of this Debenture is entitled, at his option, at any time on or before February 15, 1973, or in case this Debenture shall be called for redemption prior to such date, *then until and including*, but (if payment thereof has been duly tendered) not after, *the redemption date*, to convert this Debenture * * * into fully paid and nonassessable shares of the $7.50 par value common capital stock of the corporation, as said shares shall be constituted at the date of conversion * * *" [Emphasis supplied.]

4. The conversion provision contained the following language:
   (e) Provided, however, if any shares of common stock, reserved or to be reserved for the purpose of Debentures hereunder, require registration with or approval of any governmental authority under any Federal or State law, before such shares may be validly issued upon conversion then, in any such event, none of the Debentures may be converted until and unless such shares of common stock are registered with such Federal or State governmental authority.
   And, the Corporation covenants that it will in good faith and as expeditiously as possible endeavor to secure such registration or approval, as the case may be * * * And, the Corporation shall at all times reserve and keep available out of its authorized but unissued stock, for the purpose of effecting the conversion of the Debentures, such number of its duly authorized shares of common stock as shall from time to time be sufficient to effect the conversion of all outstanding Debentures * * *.

9. On January 4, 1961, the Board of Directors of Southwest Grease voted to redeem the 1958 debentures at a price of $1,290 for each $1,000 of debentures, to be paid by exchanging with the holders cash, and new 6% *nonconvertible* debentures. [Dkt. #12, ¶ 3(c)]. The taxpayer contacted each debenture holder and advised that the securities would be redeemed. Each holder was given a choice of receiving cash or new debentures, and while no holder initiated the negotiations, there was no disagreement with taxpayer's offer after the holders learned that they would receive common stock values for their debentures. [McCabe Deposition, pp. 17–19].

10. The Court further finds that the decision of the Board of Directors to redeem the debentures was based in part upon the fact that the expense and time element necessary for S.E.C. registration of new stock would be impractical and prohibitive.

11. In accordance with the decision of the Board of Directors, the 1958 debentures were redeemed as of February 15, 1961. Cash was paid and new debentures were issued to the following holders of the 1958 issue according to their elections, in the following amounts. [Dkt. #12 ¶3(d); Deft.'s Ex. 2].

| Bondholder | Convertible Debentures Held | New Debentures Received | Cash Received |
|---|---|---|---|
| Harold A. Mayor, Sr. | $ 90,000 | $ 70,000 | $ 46,100 |
| Harold A. Mayor, Jr. | 35,000 | 15,000 | 30,150 |
| Joe S. Johnson | 75,000 | 75,000 | 21,750 |
| Paul McIntyre | 25,000 | 20,000 | 12,250 |
| Merrill L. Carter | 25,000 | 20,000 | 12,250 |
| Charles J. Slawson | 25,000 | 20,000 | 12,250 |
| Hulda C. Beckett | 10,000 | – – – | 12,900 |
| F. W. Castholm | 25,000 | 8,000 | 24,250 |
| Mayco Investments, Inc. | 65,000 | 40,000 | 43,850 |
| Textor and Company | 25,000 | – – – | 32,250 |
| | $400,000 | $268,000 | $248,000 |

12. As of January 4, 1961, Southwest Grease had issued and outstanding a total of 195,290 shares of common stock and 899 shares of preferred stock. [Dkt. #12 ¶ 3(f)]. On January 4, 1961, the holders of the 1958 debentures owned stock in Southwest Grease in the following amounts: [Dkt. #12 ¶ 3(e)].

| | Common | Preferred |
|---|---|---|
| Harold A. Mayor, Sr. | 31,360 | None |
| Harold A. Mayor, Jr. | 23,087 | None |
| Joe S. Johnson | 23,173 | 214 |
| Paul McIntyre | 7,265 | 10 |
| Merrill L. Carter | 6,585 | 120 |
| Charles J. Slawson | 6,787 | None |
| Hulda C. Beckett | 1,250 | None |
| F. W. Castholm | 2,400 | 41 |
| Mayco Investments, Inc. | 1,000 | None |
| Textor and Company | None | None |
| | 102,907 | 385 |

13. The new debentures, dated February 15, 1961, were in the total amount of $268,000, and payable February 15, 1975. They provided for interest of 6% payable semi-annually, with interest cumulative and payable from "Consolidated Earnings Available for Interest". They were subject to redemption at a premium, upon 30 days' notice, in whole, or in part by lot, on any interest payment date. If called prior to February 15, 1965, they were redeemable at a premium rate of 105%, and thereafter the redemption price declined ½% each year until February 15, 1974, after which time, they were redeemable at face value. [Ex. 2, Dkt. #6, and 9].

14. In its federal tax return for the fiscal year 1961, Southwest Grease claimed as a deduction from ordinary gross income, $116,000 of the cash paid for redemption of the debentures, and $4,122.15 in unamortized issue cost of the 1958 issue. Upon audit, the deductions were disallowed by the Internal Revenue Service, a determination that additional taxes were due was made, and a portion of these additional taxes was attributable to adjustments for the disallowed deductions. The taxpayer paid the asserted deficiency and thereafter filed a timely claim for refund and interest attributable to disallowance of these two claimed deductions. [Dkt. #12, ¶ 2 (m)].

## CONCLUSIONS OF LAW

Taxpayer contends that it is entitled to summary judgment as a matter of law by reason of Treasury Regulation 1.61–12(c) (1), as effective in 1961, implementing Section 162(a) of the Revenue Code, which authorizes deductions for "ordinary and necessary" business expenses, even though the item of $116,000 was attributable solely to the conversion feature of the debentures. It further contends that under applicable Treasury Regulations, it is entitled to deduct, in the year of redemption, the full unamortized issue costs attributable to the 1958 debentures in the amount of $4,122.15.

The government contends that the premium which taxpayer paid in redeeming its securities was in fact paid to redeem instruments which were more in the nature of stock than of debt, and thus the payment was not a true interest expense or ordinary and necessary business expense, within the meaning of § 162(a), and Treasury Regulation 1.61–12 (c) (1).

Section 162(a), Title 26 U.S.C.A. provides in pertinent part:

There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *.

While no section of the Code contains a specific provision regarding a deduction for expense or loss arising from transactions by corporations which issue securities, the law on the subject has been developed through court decisions and Regulations adopted by the Treasury Department. See Helvering v. California Oregon Power Co. (1935) 64 App. D.C. 125, 75 F.2d 644; Helvering v. Union Pacific Railroad (1934) 293 U.S. 282, 55 S.Ct. 165, 79 L.Ed. 363, 367.

Treasury Regulation § 1.61–12, as it stood in 1961, deals with "Income from Discharge of Indebtedness". Paragraph (c) (1) of the Regulation sets out one of the tax consequences which follows transactions of a corporation in its own bonds:

(c) *Sale and purchase by corporation of its bonds.* (1) If bonds are issued by a corporation at their face value, the corporation realizes no gain or loss. *If the corporation purchases any of such bonds at a price in excess of the issuing price or face value, the excess of the purchase price over the issuing price or face value is a deductible expense for the taxable year.* If, however, the corporation purchases any of such bonds at a price less than the issuing price or face value, the excess of the issuing price or face value over the purchase price is in-

come for the taxable year." [Emphasis supplied.]

For purposes of this Regulation, a debenture, note, or other evidence of indebtedness bearing interest is given the same treatment as a bond. § 1.61–12(c) (5).

Other paragraphs of Treasury Regulation 1.61–12(c) provide that if the bond or other security is issued at a premium, the net amount of such premium constitutes income to the corporation, to be amortized over the life of the bond. § 1.61–12(c) (2). In the event bonds are issued at a discount, and the corporation in fact receives less than the face value of the security, the net discount is deductible, and should be amortized over the life of the bond. § 1.61–12(c) (3). Any unamortized expense remaining is deductible when the bond is retired. Vol. 7 Mertens Law of Federal Income Taxation, §§ 38.54, 38.57, Vol. 2, Mertens §§ 12.112, 12.116.

While the above quoted Regulation is numbered to implement Section 61 of the 1954 Internal Revenue Code, which concerns the recognition of income, it is apparent that the quoted portion of the Regulation concerning deductions derives its authority from § 162(a) of the Code, which authorizes deductions for ordinary and necessary business expenses. Vol. 2 Mertens, § 12.114, p. 450. The Regulation is clearly designed to reflect the true cost of the security, insofar as the issuing corporation is concerned. This was recognized in Helvering v. United Pacific Railroad Co., supra, 293 U.S. 282, 55 S.Ct. 165, 79 L.Ed. 363, where the Court ruled that commission costs and other issue expenses were similar to a "discount" loss, and deductible as losses sustained when the bond was paid at maturity, even though there was no specific provision in the Code for such deduction. The Court stated, at p. 287 of 293 U.S., at p. 168 of 55 S.Ct., at p. 367 of 79 L.Ed.:

"We think that the revenue acts, as they have been interpreted by this Court and the treasury regulations upon this and related subjects, require that this difference between receipts and disbursements of the taxpayer should, in some form, enter into the computation of his taxable income. It is a loss to the taxpayer, definite as to its date and amount, and represents a part of the cost of the borrowed capital during each year of the life of the bond issue. * * *

Before proceeding to a discussion of the applicability of Treasury Reg. § 1.61–12(c) (1) to the deduction claimed by Southwest Grease, it should be noted at this point that the Regulation, as set out above, has been in substantially the same form from 1918 until 1968. The validity of the Regulation as being a proper interpretation of the Code has been upheld by the Courts on numerous occasions. See Great Western Power Co. v. Commissioner of Internal Revenue (1936), 297 U.S. 543, 56 S.Ct. 576, 80 L.Ed. 853, 855; United States v. Kirby Lumber Co. (1931), 284 U.S. 1, 52 S.Ct. 4, 76 L.Ed. 131; Helvering v. California Oregon Power Co., supra, 75 F.2d 644; and Baltimore Steam Packet Company v. United States (Ct.Cl.1960), 180 F.Supp. 347. On December 23, 1968, the Regulation was amended by striking out the last two sentences so that it presently reads as follows:

(c) Sale and purchase by corporation of its bonds. (1) If bonds are issued by a corporation at their face value, the corporation realizes no gain or loss.

In conjunction with the amendment of 1.61–12(c) (1), the Treasury Department adopted a new Regulation, implementing *Section 163* of the Code, which authorizes deductions for *interest paid.* The Regulation, § 1.163–3 now covers deductions for "bond discount", and singles out "convertible bonds" for special tax treatment. It provides in pertinent part:

(a) Discount upon issuance. (1) If bonds are issued by a corporation at a discount, the net amount of such discount is deductible and should be

prorated or amortized over the life of the bonds * * * [Similar to § 1.61–12(c) (3)].

* * * * * *

(c) Deduction upon repurchase. (1) Except as provided in subparagraph (2) of this paragraph, if bonds are issued by a corporation and are subsequently repurchased by the corporation at a price in excess of the issue price * * * the excess of the purchase price over the issue price adjusted for amortized premium or discount is a deductible expense for the taxable year.

(2) *In the case of a convertible bond* * * * the deduction allowable under subparagraph (1) of this paragraph may not exceed an amount equal to 1 year's interest at the rate specified in the bond, except to the extent that the corporation can demonstrate to the satisfaction of the Commissioner or his delegate that an amount in excess of 1 year's interest does not include any amount attributable to the conversion feature. [Emphasis supplied.] (26 C.F.R. § 1.163–3)

In the instant case, Southwest Grease filed its 1961 tax return in reliance upon Section 162(a) of the Code and Treasury Regulation 1.61–12(c) (1) as it existed in 1961. While the government does not specifically urge that its new Regulation § 1.163–3, which singles out convertible bonds for special treatment, be given retroactive effect, it insists that the excess sum paid to redeem the 1958 debentures was not a bona fide business or interest expense, in that, it was essentially a distribution of corporate earnings attributable to stock rights inherent in the conversion feature of the debentures.

The government made a similar argument to the Tax Court in Roberts & Porter, Inc. v. Commissioner, 37 T.C. 23 (1961). There, the corporation issued convertible notes, at par, for $40,000, to the president and largest stockholder of the corporation. The notes were callable at 106%, but after his death, the corporation repurchased them for $117,763.20.

If the notes had been converted into shares, the shares would have a value of $146,340.00. It further appears that the notes were redeemed in order to prevent the holder from converting into stock and then conveying the stock to strangers. While the Tax Court agreed that the corporation admittedly had no alternative, and the price paid was arrived at after arm's length negotiation, it sustained the government's position, finding that no gain or loss should be recognized from a corporation's dealings in its own stock. The Tax Court reasoned that no deduction would have been allowed had the notes been converted, and then the stock redeemed, and that Treasury Regulation 1.61–12(c) (1), quoted above, was inapplicable to a situation where the premium paid on redemption was so obviously related to the convertible feature of the notes. In so ruling, the Tax Court felt that the payment in issue was not a "typical" situation covered by the Regulation, in that, the premium paid had no relation to the par value of the security, or its interest rate and maturity date.

On appeal, the Seventh Circuit reversed the Tax Court and upheld the deduction as an ordinary and necessary business expense, authorized by Section 162(a) of the Code, and its supplementary Treasury Regulation, § 1.61–12(c) (1). Roberts & Porter, Inc. v. Commissioner of Internal Revenue (1962), 7 Cir., 307 F.2d 745. In so ruling it found that the plain and ordinary meaning of the Regulation authorized the deduction; that the notes had not in fact been first converted into stock; that the Regulation has been in effect for many years, through amendments of the Revenue Code, and Congress did not eliminate or limit deductions authorized by the Regulation; and that there is no provision in the Code, or the Regulation which would require allocation of a part of the total price paid to the value of a conversion privilege. At pp. 747–748 of 307 F.2d, the Court reasoned:

In our opinion, the plain and ordinary meaning of Regulation 1.61–12

(c) (1) dictates that Roberts & Porter be allowed its deduction for the difference between the issuing price and the price paid to purchase and retire the notes held by the Adams estate. These notes were not, in fact, converted into stock and the stock then sold. There is no provision in the Code or the Regulations which requires allocation of a part of the total purchase price to the value of the conversion privilege. The Regulation here involved is a long standing one, of whose existence Congress is fully aware. Roberts & Porter remind us that when, in 1950, Congress amended the Internal Revenue Code * * * to eliminate amortization of bond premiums, attributable to the conversion feature of convertible bonds, by the *holders* of such bonds [See Commissioner of Internal Revenue v. Korell, 339 U.S. 619, 70 S.Ct. 905, 94 L.Ed. 1108 (1950)] Congress did not, then or later, eliminate or limit the deduction by an issuing corporation of such part of any premium, attributable to a conversion feature, which the corporation may have paid when repurchasing its own bonds. If this situation represents a breach in our revenue wall, its repair must be effected by legislative action rather than by judicial interpretation. [Emphasis supplied.]

In the Korell case, 339 U.S. 619, 70 S.Ct. 905, 94 L.Ed. 1108, cited by the Seventh Circuit, the taxpayer, an individual, purchased bonds with a face value of $100 at a price of $121.00. The bond was callable at $104, but each bond was convertible into one share of stock upon payment of an additional $40. At the time the bond was purchased the market value of one share of stock was $163. The

taxpayer amortized and deducted the premium paid to purchase the stock, figuring the premium to be the difference between his purchase price of $121, and the call price of $104. Section 125 of the Internal Revenue Code of 1942 authorized deductions for "amortizable bond premium" but the Commissioner urged that only "true premiums" were deductible and that a premium paid for a conversion privilege was not the same as premium paid for securing a higher rate of interest. The Court sustained the deduction, noting that neither the Code nor the Regulations qualified or limited the term "bond premium". A few months after the decision in Korell, Congress amended the Code, specifically excluding a deduction for premiums attributable to a conversion privilege, in the case of the holder of the bond. 26 U.S.C.A. § 171(b) (1). No similar action has been taken by Congress with respect to a corporation's deduction of a premium paid for redemption of convertible bonds.

The government contends that the conclusion reached by the Seventh Circuit is erroneous and based upon an improper interpretation of case law. The Treasury Department, by Rev.Rul. 67–409, 1967–2, Cum.Bull. 62, has announced that it will not be followed.[5] However, it is the opinion of this Court that the reasoning in Roberts & Porter, Inc. is sound, and that the decision there is of persuasive force.

In taking the position that the deductibility of redemption premiums will be limited to and correlated with interest rates, as being the true "cost of borrowing money", the Court believes that the Commissioner seeks to overlook or ignore the fact that there may be business reasons, *unrelated to the saving of*

5. The longstanding position of the Service has been that *a deduction for premiums paid by a corporation on the redemption or repurchase of its own bonds,* under the provisions of these sections [§ 1.61–12] or any other sections of the Code or regulations, *is limited to an amount which relates to the cost of borrowing money,* and, thus such excess amounts are not deductible. Because of the lack of a conflict in decisions, the Service did not apply for certiorari in Roberts & Porter, Inc.

Accordingly, the Service does not follow the decision of the Seventh Circuit in the Roberts & Porter, Inc. case as a precedent in the disposition of similar cases. [Emphasis supplied.]

*interest,* which may prompt redemption of bonds at a premium, and while such reason may be entirely unrelated to current interest rates, it may nevertheless affect the "true cost" of the borrowed funds. See Roberts & Porter, Inc., supra, 307 F.2d 745 (premium paid to prevent stock from falling into hands of outsiders); Baltimore Steam Packet Company v. United States, supra, 180 F.Supp. 347 (although debentures were callable at par plus accrued interest, a tie-vote in Board of Directors prevented such redemption). In Korell, the Supreme Court rejected the Commissioner's contention that "true premiums" related solely to interest rates, observing at 339 U.S. pp. 627–628, 70 S.Ct., p. 909, 94 L.Ed., pp. 1113–1114:

> As 'bond premium' is used by accountants and other writers in the securities field, it is any payment in addition to face value. There is no suggestion that the words have only a limited significance, echoing * * * [a] 'true' premium, applicable solely to that extra price caused by the desire to obtain a higher than average interest yield. On the contrary, some authors have noted the variety of causes which induce the payment of bond premium, and the practical impossibility of disentangling and isolating them for the purpose of relative evaluation, as would be required if [the Commissioner's] reading of the statute was upheld. We adopt the view that 'bond premium in § 125 means any extra payment, regardless of the reason therefor, in accordance with the firmly established principle of tax law that the ordinary meaning of terms is persuasive of their statutory meaning.

See also, Central & South West Corporation v. Brown (D.Del.1965), 249 F.Supp. 787, 796; Universal Tractor-Equipment Corporation v. United States (E.D. Va.1967), 67–1 U.S.T.C., CCH, ¶ 9409.

In the alternative, the government contends that Roberts & Porter is distinguishable upon its facts, in that, here there was no arm's length negotiation, and the record fails to establish the presence of a corporate business purpose in the decision to redeem the debentures at the premium price.

■ As set out in the foregoing findings, the Court has determined that the debentures established a true indebtedness of the corporation. See Edwards v. Commissioner of Internal Revenue (10th Cir. 9/17,/69) 415 F.2d 578; Universal Tractor-Equipment Corp. v. United States, supra, 67–1 U.S.T.C. CCH ¶ 9409, and cf. McSorley's, Inc. v. United States (10th Cir. 1963), 323 F.2d 900; National Farmers Union Service Corp. v. United States (10th Cir. 1968), 400 F.2d 483. The Court has further determined that taxpayer had no stock registered with the SEC to honor the conversion privilege, and upon consideration of the costs involved in such registration, and other factors involved in such an undertaking, the corporation determined, for a business reason, to redeem the 1958 securities. While it is true that the debentures could be redeemed, on call, at par plus accrued interest, they could be called only upon thirty days' notice, during which time the holders could convert into common stock. While the conversion right was dependent upon SEC registration of stock, the taxpayer was bound to secure such registration. In 1961, a $1,000 par debenture could be converted into $1,290 work of stock. Under these circumstances, it is clear that taxpayer could not have redeemed its obligations at par, for the only way the debentures could have been redeemed without a conversion taking place was to pay the holders the true value of their securities. The premium was clearly deductible under the language of Treasury Regulation § 1.61–12(c) (1), and the premium so paid in fact represented the true cost to the corporation of the $400,000 borrowed in 1958.

In reaching this conclusion, the Court would point out that it has not overlooked the fact that the debenture holders, with an exception, were shareholders

in the debtor corporation and in this respect, the transaction was not entirely at arm's length. While it is true that the form of a transaction does not control the incidence of tax liability, when the form does not reflect the actual agreement of the parties, it is also true that a payment which otherwise qualifies as a deductible expense is not rendered non-deductible simply because it was made to a stockholder or officer of a corporation. "The taxpayer's judgment as to what is appropriate and helpful to its business should not be overruled by the taxing authorities or the courts without good reason". Baltimore Steam Packet Company v. United States, supra, 180 F.Supp. at 350, and see, Welch v. Helvering (1933), 290 U.S. 111, 113, 54 S.Ct. 8, 78 L.Ed. 212, 214.

The recent decision of the Tenth Circuit in Edwards v. Commissioner, supra, 415 F.2d 578 demonstrates that the economic realities of transactions between a corporation and its stockholder may not be overlooked simply because a tax saving may benefit that stockholder. In *Edwards*, the taxpayers, Edwards and Disler, were stockholders in the Disler Corporation, which offered to buy all outstanding stock of another company for $75,000. Later it was discovered that an officer of the other company held promissory notes of that company in an amount exceeding $241,000. When the sale was consummated, $5,000 of the price was allocated to stock, with the remainder of $70,000 applied to purchase of the notes. The notes were assigned to taxpayers, and thereafter they were paid off by earnings of the Disler corporation. The taxpayers treated the payment as long term capital gain, but the Commissioner classified the payments as taxable dividends, contending that the notes did not constitute a true indebtedness of the Disler corporation. In ruling that the taxpayers were entitled to capital gain treatment, the Tenth Circuit stated:

It is of course true that the contractual form of a transaction cannot control the imposition of tax liability when the realities of the transaction show that form does not represent a bona fide and actual agreement. But it is equally true that the form of a contract is the considered and chosen method of expressing the substance of contractual agreements between parties and the dignity of contractual right cannot be judicially set aside simply because a tax benefit results either by design or accident. Form, absent exceptional circumstances, reflects substance.

\* \* \* \* \* \*

When applicable statutory laws do not prevent a shareholder of a given corporation from also becoming a creditor of that corporation and where the transaction creating the debtor-creditor relationship is not a sham or subterfuge, the terms of the transaction must be honored by the court. \* \* \* the fact that the nature of the transaction enables appellants to take advantage of the favorable provision of § 1232 is not by itself sufficient cause to disregard the form of the transaction.

Under all of the circumstances present here, the Court is of the opinion, and so concludes, that the $116,000 premium paid for redemption of the 1958 debentures constituted an ordinary and necessary business expense within the meaning of § 162(a) of the Internal Revenue Code, as implemented by Treasury Regulation § 1.61–12(c) (1), and that this premium was reasonable in amount.

The remaining question for determination concerns amortization of the premium so paid. The government contends that the excess sum of $116,000 was in fact part of the cost of the new debentures issued in 1961, and therefore it, as well as the $4,122.15 of unamortized 1958 issue costs should be amortized over the life of the new debentures.

■ Frequently, a corporation secures money to retire a series of bonds through issue and sale of new bonds, and as a general rule, the bond issues are treated as separate transactions, and the

corporation may deduct unamortized issue costs of the old bonds upon their retirement. Vol. 2, Mertens Law of Federal Income Taxation § 12.116. However, in cases where there is simply an *exchange* of old obligations for new ones, the Supreme Court has ruled that costs and expenses of redeeming the old obligations are more properly a part of the cost of the new securities, and therefore they must be amortized over the life of the new issue. Great Western Power Co. v. Commissioner of Int. Rev., supra, 297 U.S. 543, 56 S.Ct. 576, 80 L.Ed. 853, affirming the Second Circuit ruling in 79 F.2d 94.

In Great Western, the company issued a series of "B"–7% bonds in 1919 and in 1921, it issued "convertible 8% gold bonds" which were callable at 105% plus accrued interest. The 8% bonds provided that the holder could exchange them for Series "B"–7% of equal value, plus 5% in cash. In 1924 the company called the 8% bonds for redemption, and some holders exercised their option to exchange them for the 7% bonds, with the 5% cash premium. The Commissioner conceded the propriety of allowing deductions for premium, expense and unamortized discount on all 8% bonds redeemed for cash, but contended, successfully, that costs and expenses attributable to those bonds exchanged for the Series "B"–7% securities should be amortized over the life of that issue.

■ The Court is of the opinion that Great Western is not applicable to the transaction here in question. The situation in the instant case more closely resembles Commissioner of Int. Rev. v. Coastwise Trans. Corp. (1st Cir. 1932), 62 F.2d 332, 71 F.2d 104 (1934), cert. den. 293 U.S. 595, 55 S.Ct. 110, 79 L.Ed. 689, where an old issue of notes was retired by an exchange of new notes. There was no provision in the old notes calling for the exchange, and the new issue was of less value than the old series of notes. Under a Treasury Regulation similar to § 1.61–12, the Court sustained the government's contention that the difference between the face value of the two issues was taxable income in the year the notes were retired. In Commissioner of Internal Revenue v. Great Western Power, 79 F.2d 94, affirmed 297 U.S. 543, 56 S.Ct. 576, 80 L.Ed. 853, the Second Circuit found that issue expense, premiums and costs were not deductible in the year of retirement. In so ruling, it noted that the Coastwise Transportation case was distinguishable because there the exchange was not pursuant to a contract under which the retired notes were issued, but by *voluntary* agreement of the parties at the time the notes were retired. The Court also noted that in Coastwise, the notes were exchanged for a lesser amount in face value than the bonds retired.

Both of these factors are present here. The 1958 6% convertible debentures did not provide that they could be exchanged for some new type of debenture and in this respect, the 1961 debentures had no connection with the old issue. The offer made by Southwest Grease to redeem the debentures was a new and separate agreement, giving the holders the election to receive cash or the new issue. Some in fact elected to take all cash. The face value of the new 1961 debentures ($268,000) was considerably less than the value of the debentures redeemed ($400,000).

In simplified terms our holding merely gives effect to the Treasury Regulations. The Regulation 1.61–12(c) (1) authorized the deduction of the premium for the purchase of bonds in excess of the issuing price claimed by the taxpayer. This authorization by its plain terms is without qualification. The Regulation was prepared by the Treasury Department. The taxpayer relied on the Regulation, claimed the deduction and is entitled to it as well as the issue costs related to the debentures.

The taxpayer is thus entitled to deduct the premium paid for the redemption of the 1958 debentures, in the sum of $116,000.00 as well as the unamortized issue costs of those debentures in the sum of $4,122.15.

It is ordered, that Plaintiff's Motion for Summary Judgment is Sustained, and Defendant's Motion for Summary Judgment is Overruled.

It is further ordered that the parties prepare and submit for approval a proposed Judgment form.